[Cite as *State v. Eaton*, 2022-Ohio-2432.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                        Court of Appeals No.  L-21-1121

      Appellee                                    Trial Court No.  CR0201902202

v.

Adrian Eaton                                      **DECISION AND JUDGMENT**

      Appellant                                   Decided:  July 15, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy Jarrett, Assistant Prosecuting Attorney, for appellee.

Autumn Adams, for appellant.

* * * * *

**ZMUDA, J.**

## I.    Introduction

{¶ 1} Appellant, Adrian Eaton, appeals the judgment of the Lucas County Court of

Common Pleas, sentencing him to an indefinite term of 13 to 18 years in prison after he

pled guilty to one count each of involuntary manslaughter, robbery, and aggravated

burglary.  Finding no error in the proceedings below for the following reasons, we affirm.

## A. Facts and Procedural Background

{¶ 2} On July 11, 2019, appellant was indicted on one count of aggravated murder in violation of R.C. 2903.01(B), an unspecified felony, one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unspecified felony, one count of aggravated robbery in violation of R.C. 2911.01(A)(1) and (C), a felony of the first degree, and one count of aggravated burglary in violation of R.C. 2911.11(A)(2) and (B), a felony of the first degree. Each of the foregoing counts included a firearm specification under R.C. 2941.145. These charges stemmed from a shooting that took place at an apartment located at 1324 Ironwood Avenue, Toledo, on July 6, 2019. Tragically, one of the residents of the apartment, Tyler Carr, was killed during the shooting. Three other individuals associated with appellant, Dominique Roberts, Justin Wright, and Darion Martin, were also at the scene of the murder and indicted on the same charges.

{¶ 3} Appellant initially entered a plea of not guilty to the foregoing charges, and the matter proceeded through pretrial discovery and motion practice. Eventually, on March 26, 2021, appellant appeared before the trial court for a change of plea hearing. At the hearing, the parties informed the trial court that they had reached a plea agreement. The state articulated the agreement, under which appellant agreed to enter a guilty plea to one count of the lesser-included offense of involuntary manslaughter in violation of R.C. 2903.04(A) and (C), a felony of the first degree, along with an attendant firearm specification, one count of the lesser-included offense of robbery in violation of R.C. 2911.02(A)(1) and (B), a felony of the second degree, and one count of aggravated

2.

burglary in violation of R.C. 2911.11(A)(2) and (B), a felony of the first degree. In exchange for these pleas, the state agreed to dismiss the charge of aggravated murder and the firearm specifications attached to the charges of aggravated robbery and aggravated burglary, and recommend a concurrent sentence.

{¶ 4} Following the state's articulation of the terms of the plea agreement, the trial court engaged appellant in a thorough Crim.R. 11 colloquy. Thereafter, the court determined that appellant entered his plea knowingly, voluntarily, and intelligently, accepted the plea, and proceeded immediately to sentencing upon the request of appellant's defense counsel.

{¶ 5} Ultimately, the trial court adopted the state's sentencing recommendation and ordered appellant to serve 10 to 15 years in prison for involuntary manslaughter, 6 years for robbery, and 6 years for aggravated burglary. The court ordered these sentences served concurrent to one another, but consecutive to the mandatory three-year sentence associated with the firearm specification, for an aggregate indefinite sentence of 13 to 18 years in prison. The court informed appellant of the statutory procedure pertaining to his release from confinement at the expiration of his minimum term and the circumstances under which that release could be delayed. At this point, appellant's defense counsel objected, stating: "To the extent that the ODRC can keep Mr. Eaton in prison longer than the state minimum term without any court intervention, we would object to that on a constitutional – unconstitutional basis." The trial court summarily overruled the objection and finished its sentencing of appellant.

3.

**{¶ 6}** On March 29, 2021, the trial court released its sentencing entry. Three months later, on June 17, 2021, appellant filed a pro se motion to file a delayed appeal. We granted appellant's motion on August 17, 2021, after which appellant was appointed counsel and the matter proceeded through briefing. The matter was submitted to this court on the briefs on March 15, 2022, and it is now decisional.

## B. Assignments of Error

**{¶ 7}** On appeal, appellant raises the following assignment of error for our review:

The sentencing provisions of Senate Bill 201, otherwise known as the Reagan Tokes Act, are unconstitutional.

## II. Analysis

**{¶ 8}** In his sole assignment of error, appellant argues, as he did at sentencing, that the sentencing scheme established under S.B. 201, identified under R.C. 2901.011 as the Reagan Tokes Law, is unconstitutional because it violates the separation-of-powers doctrine and infringes upon his due process rights.

**{¶ 9}** At the outset, we note that this court, via a panel of visiting judges sitting by assignment by the Ohio Supreme Court, has already found the Reagan Tokes Law constitutional. *State v. Maddox*, 6th Dist. Lucas No. L-19-1253, 2022-Ohio-1350. We issued our decision as to the merits of the defendant's constitutional argument in *Maddox* after the case was remanded by the Ohio Supreme Court upon its determination that a facial challenge to the Reagan Tokes Law is ripe for review. *See State v. Maddox*, 2022-Ohio-764, --- N.E.3d ----. While we could simply rely upon our prior determination as to

4.

the constitutionality of the Reagan Tokes Law and reject appellant's argument on that basis, we will thoroughly address appellant's argument based on a recognition of the brevity of the analysis set forth in *Maddox* and its mere adoption of the dissenting opinion in *State v. Wolfe*, 5th Dist. Licking No. 2020CA00021, 2020-Ohio-5501.[1]

{¶ 10} Additionally, we note that the constitutionality of the Reagan Tokes Law has been addressed by other appellate courts in this state. In every instance, courts have deemed the sentencing scheme embodied in the Reagan Tokes Law constitutional. Indeed, in *State v. Ratliff*, 5th Dist. Guernsey No. 21CA000016, 2022-Ohio-1372, the Fifth District found the Reagan Tokes Law constitutional and noted:

> The Second District Court of Appeals found the law constitutional in *State v. Barnes*, 2nd Dist. Montgomery No. 28613, 2020-Ohio-4150, *State v. Leet*, 2nd Dist. Montgomery No. 28670, 2020-Ohio-4592, and *State v. Ferguson*, 2nd Dist. Montgomery No. 28644, 2020-Ohio-4153. The Third District found the law constitutional in *State v. Hacker*, 3rd Dist. Logan No. 8-20-01, 2020-Ohio-5048. The Twelfth District Court of Appeals also determined the law was constitutional in *State v. Guyton*, 12th Dist. Butler

---

[1] Since *Maddox* was issued, we have released two additional decisions addressing the constitutionality of the Reagan Tokes Law. In *State v. Gifford*, 6th Dist. Lucas No. L-21-1201, 2022-Ohio-1620, we addressed only the separation of powers issue, and in *State v. Stenson*, 6th Dist. L-20-1074, we addressed both separation of powers and due process. Notwithstanding these decisions, we must fully examine the arguments raised by appellant in this case given the nuances contained in these arguments. Although we arrive at the same conclusion reached in our prior cases, we do so using a different analysis.

5.

No. CA2019-12-203, 2020-Ohio-3837, and *State v. Morris*, 12th Dist. Butler No. CA2019-12-205, 2020-Ohio-4103. Moreover, in *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470, the court, sitting en banc, held that the Reagan Tokes Law is constitutional in that it does not violate the separation-of-powers doctrine and does not violate either a defendant's right to a jury trial or due process of law.

*Id.* at ¶ 64.[2]

**{¶ 11}** Cognizant of the fact that the foregoing decisions have all concluded that the Reagan Tokes Law is constitutional, we now turn to our analysis of the Reagan Tokes Law. We will begin with a brief explanation of the Reagan Tokes Law and a summary of the arguments advanced by appellant and the state in this case. We will then examine the standard of proof applicable to facial constitutional challenges like that raised by appellant. Thereafter, we will examine whether the Reagan Tokes Law violates the separation-of-powers doctrine. Finally, we will consider whether the Reagan Tokes Law runs afoul of the Due Process Clause of the United States Constitution and its counterpart in the Ohio Constitution.

---

[2] Notably, the Fifth District issued its decision in *Ratliff* on the same day in which our decision in *Maddox* was issued by a panel of visiting judges from the Fifth District.

6.

*A. The Reagan Tokes Law and Summary of the Arguments*

**1. Brief Overview of the Reagan Tokes Law**

{¶ 12} In 2018, the Ohio General Assembly passed S.B. 201, which modified Ohio's "truth-in-sentencing" scheme that had been in place since July 1996 by adopting an indefinite sentencing scheme for certain serious felonies committed in Ohio. This bill, commonly referred to as the Reagan Tokes Law, went into effect on March 22, 2019. It amended over 50 existing sections of the Ohio Revised Code and enacted four new sections, including R.C. 2901.011, 2929.144, 2967.271, and 5120.038. *Delvallie*, 2022-Ohio-470, --- N.E.3d ----, at ¶ 2 (8th Dist.), citing R.C. 2901.011. In general terms, the Eighth District recently described the Reagan Tokes Law as "an effort to return Ohio to its core sentencing approach, implementing the reformative incentive for offenders that was lost to the definite sentencing structure." *Id.* at ¶ 12.

{¶ 13} Of the many changes to Ohio's criminal sentencing scheme that were brought about by the Reagan Tokes Law, the change that is most pertinent to our present discussion centers around R.C. 2967.271(B)-(F), which permits prison authorities within the executive branch to hold defendants in confinement during the indefinite portion of their sentence for conduct that violates prison rules and regulations. The subsections at issue in R.C. 2967.271 may be summarized as follows:

- R.C. 2967.271(B) – release of an offender serving a non-life indefinite prison term is presumed to occur at the expiration of his minimum prison term or earned early release date, whichever is earlier

7.

- R.C. 2967.271(C) – Ohio Department of Rehabilitation and Correction ("ODRC") may rebut the presumption for release if it holds a hearing and determines any of the following applies:

    1. The defendant acted in a manner demonstrating he has not been rehabilitated and remains a threat to society, namely by committing a violation of law that was not prosecuted or violating prison rules that compromised prison security or staff safety, or threatened physical harm to prison staff or inmates;

    2. ODRC has placed the defendant in extended restrictive housing at any time within the year preceding the date of the hearing; or

    3. The defendant is classified by ODRC as a security level three or higher at the time of the hearing

- R.C. 2967.271(D) – Upon rebutting the presumption for release, ODRC may "maintain" the defendant in confinement for a "reasonable period determined by [ODRC]," up to the defendant's maximum prison term

- R.C. 2967.271(E) – ODRC must notify interested parties (not including the defendant) of release hearings in the same manner as it provides notice of the possible release of parole inmates

- R.C. 2967.271(F) – Director of ODRC may recommend a reduction in the defendant's minimum prison term (except in cases involving sexually oriented

offenses), which creates a presumption in favor of said reduction that may be rebutted by the prosecutor at a hearing

**2. Summary of Parties' Arguments**

{¶ 14} In asserting a facial challenge to the constitutionality of the Reagan Tokes Law, appellant makes two arguments. First, appellant argues the Reagan Tokes Law violates the separation-of-powers doctrine. Second, appellant argues that the Reagan Tokes Law does not satisfy the due process protections guaranteed by the Ohio and U.S. Constitutions. Appellant's arguments are summarized below:

A. Separation-of-Powers

{¶ 15} Appellant argues that the Reagan Tokes Law, on its face, violates the separation-of-powers doctrine because it provides the ODRC – an executive branch agency – with the authority to adjudicate an individual's guilt for certain conduct that occurred while imprisoned *and* to sentence that individual to an additional prison term upon such a finding.

{¶ 16} A sentence imposed under the Reagan Tokes Law includes both a minimum and maximum prison term. The minimum term is the amount of time an individual must serve prior to their presumptive release.[3] The remaining portion of the prison term, up to the maximum, is the indefinite portion that is only served if the ODRC

---

[3] The statute also permits early release from a minimum prison term, as approved by the trial court, under certain conditions. Appellant does not specifically challenge this provision of the Reagan Tokes Law.

9.

rebuts the presumption that the offender will be released at the conclusion of the minimum term. As described above, R.C. 2967.271 provides the bases on which ODRC may rebut the presumption that a prisoner will be released. In general, these bases relate to the placement of the prisoner at certain security levels and the prisoner's violation of facility rules during the minimum term, any of the prisoner's conduct that threatens the safety of correctional facility employees or other inmates, and the prisoner's commission of criminal offenses that were not prosecuted. If ODRC rebuts the presumption of release, it may order the prisoner to serve some or all of the indefinite portion of the prison term imposed at sentencing.

{¶ 17} Appellant argues that the Reagan Tokes Law sentencing scheme, by permitting the ODRC to determine whether the prisoner must serve the indefinite portion of their sentence based on conduct that occurred during confinement, improperly usurps the judicial branch's exclusive authority to determine guilt and impose criminal sentences. As a result, appellant argues that the Reagan Tokes Law, on its face, violates the separation-of-powers doctrine and is unconstitutional.

B. Due Process

{¶ 18} In terms of due process arguments, appellant first asserts that convicted defendants like himself have a liberty interest, namely a right to be free from confinement, which is placed in jeopardy during additional term hearings[4] conducted

---

[4] Additional term hearing, as used by the ODRC in its administrative regulations, refers to the hearing conducted by the ODRC to determine whether an inmate should be

under the Reagan Tokes Law. Appellant complains that his continued confinement may be based upon unprosecuted violations of law committed while in prison, and thus reasons that all additional term hearings conducted under the Reagan Tokes Law must include certain procedural safeguards including (1) a trial, (2) findings of fact and determination of guilt by a jury, and (3) representation of counsel, including appointed counsel.

{¶ 19} Appellant contends that the Reagan Tokes Law, on its face, deprives him of his due process rights because it does not afford him any of the aforementioned safeguards during the additional term hearing that will take place after the completion of the minimum portion of his sentence. Because his liberty interest, the right to be free from confinement, is deprived without these procedural safeguards, appellant concludes that the Reagan Tokes Law is facially unconstitutional.

## B. *Standard Applicable to a Facial Constitutional Challenge*

{¶ 20} As already noted, the constitutional challenge raised by appellant in this case is a facial challenge. "A statute may be challenged as unconstitutional on the basis that it is invalid on its face or as applied to a particular set of facts." *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, 861 N.E.2d 512, ¶ 17. The standard of proof for a facial challenge is different than the standard of proof for an as-applied challenge. *Wymsylo v. Bartec, Inc.*, 132 Ohio St.3d 167, 2012-Ohio-2187, 970 N.E.2d 898, ¶ 20.

---

maintained in prison beyond the minimum prison term imposed by the sentencing court under the Reagan Tokes Law.

11.

{¶ 21} When a statute is challenged on its face, the challenger must provide proof beyond a reasonable doubt that no set of circumstances exists under which the statute would be valid. *Adams v. DeWine*, 2022-Ohio-89, --- N.E.3d ----, ¶ 27, citing *Ohio Renal Assn. v. Kidney Dialysis Patient Protection Amendment Commt.*, 154 Ohio St.3d 86, 2018-Ohio-3220, 111 N.E.3d 1139, ¶ 26 and *Wymsylo* at ¶ 20. "A facial challenge to a statute is the most difficult to bring successfully because the challenger must establish that there exists no set of circumstances under which the statute would be valid." *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37, citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). A statute is not constitutionally infirm on its face merely because it may "operate unconstitutionally under some plausible set of circumstances." *Id.*

{¶ 22} By contrast, where one challenges a statute on the ground that it is unconstitutional as applied to a particular set of facts, the challenger "bears the burden of presenting clear and convincing evidence of a presently existing set of facts that make the statutes unconstitutional and void when applied to those facts." *Harrold* at ¶ 38, citing *Belden v. Union Cent. Life Ins. Co.*, 143 Ohio St. 329, 55 N.E.2d 629 (1944), paragraph six of the syllabus.

{¶ 23} In his brief, appellant argues that the Reagan Tokes Law is unconstitutional on its face. Thus, in order to prevail, appellant must prove, beyond a reasonable doubt, that there are no set of circumstances under which the Reagan Tokes Law would be constitutional. It is with this standard in mind that we proceed.

12.

*C.  Separation-of-Powers*

**1. General Legal Principles Concerning the Separation-of-Powers Doctrine**

{¶ 24} In *Mistretta v. U.S.,* 488 U.S. 361, 109 S.Ct. 647, 102 L.E.2d 714 (1989), the United States Supreme Court provided a broad overview of the separation-of-powers doctrine as applicable to felony sentences and the appropriate nature of appellate court review of legislative actions which allegedly violate that doctrine.[5]  The court's analysis began by emphasizing the importance of the separation-of-powers doctrine and noting that it has "consistently * * * given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers in three coordinate branches is essential to the preservation of liberty." *Id.* at 380.

{¶ 25} Relevant to the present appeal, the court addressed the separation-of-powers doctrine as it relates to indefinite sentencing, stating:

> Statutes specified the penalties for crimes but nearly always gave the
>
> sentencing judge wide discretion to decide whether the offender should be
>
> incarcerated and for how long, whether he should be fined and how much,

---

[5] The ultimate issue resolved in *Mistretta* was whether Congress' creation of a sentencing commission to establish binding sentencing guidelines for federal offenses, thereby eliminating the trial court's discretion to select the sentence it deemed was appropriate, was an unconstitutional delegation of judicial power.  The court ultimately determined that because Congress established the scope of the trial court's discretion in sentencing that the limitation of that discretion was a power granted to the legislative branch and that no separation-of-powers violation occurred.

13.

and whether some lesser restraint, such as probation, should be imposed instead of imprisonment or fine. This indeterminate sentencing system was supplemented by the utilization of parole, by which an offender was returned to society under the "guidance and control" of a parole officer.

*Id.* at 363. Moreover, the indeterminate nature of the trial court's sentencing decision, coupled with the parole officer's discretion in whether the offender should be "returned to society" is demonstrated by federal sentencing statutes which "required the judge and the parole officer to make their respective sentencing and release decisions upon their own assessments of the offender's amenability to rehabilitation." *Id.*

{¶ 26} Over time, the legislature's desire to grant this broad discretion to both the judiciary and the executive branches resulted in statutes that provided discretion to the judge at the time of sentencing and to the parole officer upon the offender's statutory eligibility for release before serving the maximum sentence. *Id.* at 650-651. As a result, both the judicial branch and the executive branch exercise broad discretion in determining the length of time a convicted offender may actually serve in prison. Each branch's ostensibly competing discretion, however, does not, on its face, violate the separation-of-powers doctrine.

{¶ 27} "Historically, federal sentencing—the function of determining the scope and extent of punishment—*has never* been thought to be assigned by the Constitution to the exclusive jurisdiction of any one of the three Branches of Government." *Id.* at 650, citing *U.S. v. Wiltberger,* 18 U.S. 76, 5 L.Ed. 37 (emphasis added). Instead, Congress

14.

has the power to fix the potential sentence to be imposed by the trial court, and to establish the trial court's discretion to impose that sentence. *Id.* at 651, citing *Ex. Parte U.S.,* 242 U.S. 27. 37 S.Ct. 72, 61 L.Ed. 129 (1916). Conversely, Congress has also provided "almost absolute discretion over the parole decision" to the executive branch through its parole officers. *Id.,* citing *Brest v. Ciccone,* 371 F.2d 981, 982-83 (8th Cir.1967). Regarding the late-twentieth century shift toward indefinite sentencing schemes, the court in *Mistretta* stated:

> Congress delegated almost unfettered discretion to the sentencing judge to determine what the sentence should be within the customarily wide range so selected. This broad discretion was further enhanced by the power later granted the judge to suspend the sentence and by the resulting growth of an elaborate probation system. *Also, with the advent of parole, Congress moved toward a "three-way sharing" of sentencing responsibility by granting corrections personnel in the Executive Branch the discretion to release a prisoner before the expiration of the sentence imposed by the judge. Thus, under the indeterminate-sentence system, Congress defined the maximum, the judge imposed a sentence within the statutory range (which he usually could replace with probation), and the Executive Branch's parole official eventually determined the actual duration of imprisonment.*

*Id.* at 364-365 (emphasis added).

15.

{¶ 28} *Mistretta* describes the separation-of-powers doctrine as it relates to federal sentencing statutes under the United States Constitution. This doctrine is not explicitly stated in the United States Constitution, but "was woven into the documents that [the framers of the Constitution] drafted in Philadelphia in the summer of 1787." *I.N.S. v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), citing *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In Ohio, too, there is no "constitutional provision specifying the concept of separation of powers[.]" *State v. Warner,* 55 Ohio St.3d 31, 43, 564 N.E.2d 18 (1990). Instead, "this doctrine is implicitly embedded in the framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of the state government." *Id.* at 43-44. For this reason, the United States Supreme Court's development of the separation-of-powers doctrine and its parameters, absent specific provisions providing otherwise in the Ohio Constitution, is instructive for our analysis.

{¶ 29} In sum, the holding in *Mistretta* establishes that the "three-way sharing" among the legislative, judicial, and executive branches in the realm of indeterminate sentencing does not violate the separation-of-powers doctrine when the legislature establishes the prison terms that may be imposed, the judiciary imposes a sentence in compliance with that statutory edict, and the executive branch is authorized to determine the portion of that sentence that the offender will ultimately serve, up to the maximum imposed by the sentencing court. Therefore, to successfully argue that the Reagan Tokes Law's sentencing scheme violates the separation-of-powers doctrine, appellant must

16.

demonstrate that the authority granted to ODRC to determine whether he will serve the indeterminate portion of the sentence imposed by the trial court exceeds this three-way sharing model and actually usurps powers granted solely to the judiciary.

### 2. Authority of the Coordinate Branches under Reagan Tokes Law

{¶ 30} It is well-established that "in Ohio, judges have no inherent power to create sentences and the only sentence that a trial judge may impose is that provided for by statute." *State v. Hitchcock,* 157 Ohio St.3d 215, 2019-Ohio-3246, 134 N.E.3d 215, ¶ 18. The legislature's current "comprehensive sentencing scheme," which was enacted in 1995, acknowledged that "the parameters of sentencing are established by the legislature" and "Ohio courts may only impose sentences that are authorized by statute." *Id.* at ¶ 19. The legislature's plenary power to prescribe crimes and fix penalties rather than the judiciary crafting its own sentences has consistently been held constitutional against separation-of-power challenges. *See State v. Anderson,* 143 Ohio St. 3d 173, 2015-Ohio-2089, 35 N.E.3d 512; *State v. Beasley,* 14 Ohio St.3d 74, 75, 471 N.E.2d 774 (1984), quoting *Colegrove v. Burns,* 175 Ohio St. 437, 438, 195 N.E.2d 811 (1964); *see also State v. Morris,* 55 Ohio St.2d 101, 112, 378 N.E.2d 708 (1978), citing *Toledo Mun. Court v. State ex rel. Platter,* 126 Ohio St. 103, 184 N.E. 1 (1933).

{¶ 31} Once a prison term has been imposed, the power to carry out that sentence has been delegated by the General Assembly's legislative authority to the executive branch, namely through the ODRC. R.C. 5120.01 *et seq.*, Ohio Adm.Code 5120-2-03, *et seq.* Such a delegation has been found constitutional under a separation-of-powers

17.

challenge. *See Woods v. Telb,* 89 Ohio St.3d 504, 733 N.E.2d 1103 (2000) (holding that ODRC's authority to impose A prison term following violations of conditions of post-release control did not violate separation-of-powers doctrine); *Budd v. Kinelka,* 10th Dist. Franklin No. 01AP-1478, 2002-Ohio-4311, ¶ 15, citing *Rose v. Haskins,* 388 F.2d 91 (6th Cir.1968) (holding that Ohio's parole system did not violate the separation-of-powers doctrine).

{¶ 32} As described in *Mistretta,* all three branches of government play some role in establishing the sentences imposed for criminal conduct. This interplay between three branches of Ohio government is embedded in the structure and text of the Reagan Tokes Law. The legislature, by virtue of passing the statute, has established "an indefinite sentencing system for non-life, first and second-degree felonies committed on or after its effective date." *State v. Sawyer,* 165 N.E.3d 844, 2020-Ohio-6980, ¶ 18 (6th Dist.), citing *State v. Polley,* 6th Dist. Ottawa No. OT-19-039, 2020-Ohio-3213, ¶ 5, fn. 1. At sentencing, the trial court imposes an indefinite prison sentence, pursuant to R.C. 2929.14, which falls within the scope of sentences established by the legislature under the Reagan Tokes Law. The defendant is then transferred into the custody of the ODRC, which carries out the sentence imposed by the judiciary.

{¶ 33} This court has previously described the imposition of indeterminate sentences and ODRC's enforcement of those sentences as follows:

> The [Reagan Tokes] Law specifies that the indefinite prison terms will
> consist of a minimum term, selected by the sentencing judge from a range

18.

of terms set forth in R.C. 2929.14(A), and a maximum term determined by formulas set forth in R.C. 2929.144. The Law establishes a presumptive release date from prison at the end of the minimum term, but the [ODRC] may rebut the presumption if it determines, after a hearing, that one or more factors apply, including that the offender's conduct while incarcerated demonstrates that he continues to pose a threat to society. R.C. 2967.271(B), (C)(1), (2) and (3). If ODRC rebuts the presumption, the offender may remain incarcerated for a reasonable, additional period of time, determined by ODRC, but not to exceed the offender's maximum prison term. R.C. 2967.271(D).

*State v. Sawyer,* 165 N.E.3d 844, 2020-Ohio-6980, ¶ 18 (6th Dist.). In other words, the plain text of the statute permits the trial court to impose a sentence which reflects the three-way sharing of sentencing decisions between the three branches of government as described in *Mistretta.*

{¶ 34} This plain language application of *Mistretta* to the Reagan Tokes Law is supported in practice by the scope of the sentences imposed under the law. That is, a clear identification of what constitutes a "sentence" under the Reagan Tokes Law not only clarifies the application of the holding in *Mistretta* but also facilitates this court's analysis under appellant's separation-of-powers argument.

{¶ 35} In our review of the prior decisions from other Ohio appellate districts addressing the Reagan Tokes Law's constitutionality, we find that those decisions

arguably, but certainly unintentionally, may leave the reader with the inference that the lawful prison term for a qualifying Reagan Tokes Law offense is only the definite, minimum term imposed. The determination of the indefinite portion of the sentence, then, would be a mere function of statutory application of the time calculation formula established in R.C. 2929.144. We believe this is an incorrect interpretation of what constitutes a sentence under the Reagan Tokes Law. To avoid any confusion on this issue, we find it necessary to definitively state that the sentence imposed under the Reagan Tokes Law includes both the definite minimum as well as the maximum, indefinite prison term. This conclusion comports with Ohio's other indefinite sentence provision for unclassified felonies in R.C. 2929.02.

{¶ 36} An adult offender convicted of murder under R.C. 2903.02 is subject to an indefinite sentence of fifteen years to life in prison. R.C. 2929.02(B)(1).[6] In *State v. Henderson,* 161 Ohio St.3d 285, 2020-Ohio-4784, 162 N.E.3d 776, the Ohio Supreme Court addressed the indefinite nature of an offender's sentence in that both the definite minimum and indefinite portions of the prison term constituted individual components of a single sentence imposed for the offense. *Id.* at ¶ 40. Henderson was subject to a prison term of 15 years to life pursuant to R.C. 2929.02(B) as part of his murder conviction. The sentencing court, however, imposed only "15 years" in prison for the offense, failing

---

[6] Certain conduct by an offender in the commission of the offense may increase the minimum term to be served under R.C. 2929.02(B)(1), (2), and (3). Each of those subsections still requires the imposition of an indefinite prison term and do not impact our analysis here.

20.

to impose the indefinite life imprisonment portion of the sentence. The scope of that sentence, on appeal from the state's motion to resentence Henderson filed just prior to the expiration of his 15-year term, ultimately reached the Ohio Supreme Court. The court found the trial court had imposed an unlawful sentence when it failed to include the indefinite portion of the prison term. *Id.* The court found that the "sentence" authorized by R.C. 2929.02(B) must include both the maximum life prison term as well as the definite minimum term to be served. In light of this conclusion, it cannot be argued that the prison term imposed for murder in violation of R.C. 2903.02 is only the minimum to be served. If it were, the trial court's failure to have imposed the indefinite life provision would not have rendered the sentence unlawful.

{¶ 37} The same rationale is applicable to a sentence imposed under the Reagan Tokes Law. A sentence that fails to impose a mandatory provision is contrary to law. *State v. Underwood,* 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 20-21. Because the Reagan Tokes Law mandates the imposition of both a minimum and maximum prison term, the failure to impose that provision would result in a sentence that is contrary to law. *See State v. Simmons,* 2021-Ohio-939, 169 N.E.3d 728, ¶ 23 (8th Dist). As a result, we find that the scope of the sentence imposed under the Reagan Tokes Law includes *both* the minimum and maximum prison term and definitively repudiate any inference that the sentence includes only the minimum prison term.

21.

**{¶ 38}** Having provided a general overview of the separation-of-powers analysis required under *Mistretta,* and having defined the scope of a prison sentence imposed under the Reagan Tokes Law, we turn to appellant's separation-of-powers argument.

**{¶ 39}** Appellant does not allege a separation-of-powers violation stemming from the legislature's exercise of authority in enacting the Reagan Tokes Law or the judiciary's exercise of authority in imposing sentences. Instead, appellant complains of the procedure established under the statute permitting the executive branch, namely the ODRC, to order him to serve the indefinite portion of his sentence up to the maximum term established under R.C. 2929.144. Appellant argues that this delegation of authority results in the executive branch's usurpation of the judiciary's exclusive power to determine guilt and impose sentences. Appellant argues that this delegation of authority results in the executive branch's usurpation of the judiciary's exclusive power to determine guilt and impose sentences and, as a result, that the actual sentence imposed under the Reagan Tokes Law is only the minimum prison term. That term, he continues, can only be extended to result in service of the maximum prison term if ODRC determines that his conduct while imprisoned warranted the additional term. Therefore, he argues, the ODRC performs the judicial function of finding him guilty of and sentencing him to a prison term for his conduct while incarcerated rather than ordering him to serve the maximum term imposed on his original conviction. Since a finding of guilt and the imposition of sentence are powers reserved to the judiciary, appellant contends that the Reagan Tokes Law violates the separation-of-powers doctrine.

22.

**{¶ 40}** Our resolution focuses on comparable statutes and how Ohio courts have resolved similar separation-of-powers challenges in those instances.

### 3. Comparison of Regan Tokes Sentencing Scheme to Other Sentencing Schemes

   A.  <u>Extension of a Definite Prison Term Pursuant to R.C. 2967.11 (Ohio's former "Bad Time" statute)</u>

**{¶ 41}** The primary argument raised by appellant is that the indefinite sentencing scheme under the Reagan Tokes Law is comparable to Ohio's former "bad time" statute, which was held unconstitutional in *State ex rel. Bray v. Russell,* 89 Ohio St.3d 132, 729 N.E.2d 359 (2000).  In *Bray,* the Adult Parole Authority ("APA") added an additional incarceration term of 90 days to Bray's original sentence pursuant to R.C. 2967.11 – Ohio's "bad time" statute.[7]  That statute authorized the APA to impose additional prison time for "violations" an offender committed while serving their judicially-imposed prison term on their original conviction.  A "violation" under R.C. 2967.11 was limited to "an act that is a criminal offense under the law of this state or the United States, whether or not a person is prosecuted for the commission of the offense."  If, after following the procedure outlined in the statute, the APA determined through "clear and convincing evidence" that the offender committed a violation, it was authorized to impose additional days the offender must serve beyond the prison term imposed at their sentencing.

---

[7] R.C. 2967.11(B) defined the extended prison term as "bad time," the name by which the statute is consistently referenced in *Bray.*

23.

{¶ 42} Bray challenged the imposition of additional days arguing that R.C. 2967.11 violated the separation-of-powers doctrine by granting constitutional powers of the judicial branch – that is, the prosecution, finding of guilt, and imposition of sentence for criminal offenses—to the executive branch. The Ohio Supreme Court held that the statute did indeed violate the separation-of-powers doctrine. The court stated that the provisions of R.C. 2967.11 "enable the executive branch to prosecute an inmate for a crime, to determine whether a crime has been committed, and to impose a sentence for that crime. This is no less than the executive branch's acting as judge, prosecutor, and jury." *Bray* at 135. "The determination of guilt in a criminal matter and the sentencing of a defendant convicted of a crime are solely the province of the judiciary." *Id.* at 136. As a result, the court found that the statute authorizing the executive branch to add additional time to a prisoner's sentence, time which, by definition, was not imposed by the judiciary, "intrudes well beyond the defined role of the executive branch as set forth in our constitution." *Id.*

{¶ 43} Here, appellant argues that any order by ODRC that a prisoner serve the indefinite portion of their sentence under the Reagan Tokes Law likewise grants judicial powers to the executive branch. A thorough review and comparison of the two statutory provisions leads us to the inescapable conclusion that the "bad time" statute is factually distinguishable and thus the case law analyzing that statute is inapplicable here.

{¶ 44} Under the Reagan Tokes Law, specifically R.C. 2929.14 and 2929.144, a lawful sentence imposed on qualifying felonies must include *both* the minimum prison

24.

term as well as the maximum prison term. Thus the entirety of the potential prison term the offender may serve is announced and imposed by the court at sentencing. The Eighth District Court of Appeals, rejecting a similar separation-of-powers argument in *Delvallie*, *supra*, -- N.E.3d --, 2022-Ohio-470, noted that "when the power to sanction is delegated to the executive branch, a separation-of-powers problem is avoided if the sanction is originally imposed by a court and included in its sentence." *Id.* at ¶ 35, citing *Ferguson, supra*, 2d Dist. Montgomery No. 28644, 2020-Ohio-4153, at ¶ 23. By imposing the entirety of the sentence an offender could serve at sentencing but permitting ODRC to determine whether the maximum sentence *should* be served, the Reagan Tokes Law does not authorize the ODRC to order a prisoner to serve a term longer than the maximum duration imposed by the court at sentencing. *Id.* at ¶ 35. This process is distinguishable from the "bad time" statute that "provided the executive branch the power to keep a prisoner in jail beyond the sentence imposed by the trial court." *Id.* at ¶ 34, citing *Bray*.

{¶ 45} As the former "bad time" statute and the Reagan Tokes Law are readily distinguishable, the Ohio Supreme Court's decision in *Bray* is neither instructive nor persuasive here. The Reagan Tokes Law does not authorize ODRC to order a prisoner to serve additional time beyond that which was imposed by the trial court at sentencing.

{¶ 46} Our research, then, turns to other comparable challenges to Ohio sentencing statutes to guide our analysis as to whether the Reagan Tokes Law violates the separation-of-powers doctrine.

B. Post-release Control

{¶ 47} In *Woods*, *supra*, 89 Ohio St.3d 504, 2000-Ohio-171, 733 N.E.2d 1103, the Ohio Supreme Court considered a constitutional challenge to Ohio's post-release control system alleging that the statute violated the separation-of-powers doctrine. R.C. 2967.28, Ohio's post-release control statute, created a "period of supervision by the adult parole authority after a prisoner's release from imprisonment that includes one or more post-release control sanctions[.]" *Id.* at 508. Post-release control for individuals convicted of first, second, and certain third degree felonies is mandatory upon their release. *Id.* Post-release control for individuals convicted of any felonies other than those specifically enumerated is imposed upon the individual's release at the discretion of the APA. *Id.* R.C. 2967.28(D) outlines the factors which the APA must consider in exercising that discretion. *Id.* Regardless of whether the post-release control is mandatory or discretionary, the trial court is obligated to provide notice of the imposition of post-release control at the sentencing hearing. *State v. Bates,* -- Ohio St.3d ---, 2022-Ohio-475, --- N.E.3d ----, ¶ 11.

{¶ 48} In 1996, Woods was sentenced to a ten-month prison term following his conviction for theft, a fifth-degree felony. At sentencing, Woods was advised that upon release from prison, he was subject to post-release control and, following a determination by the APA that he violated that control, he could be returned to prison for up to 50% of his stated term. Upon his release after his original ten-month term expired, Woods was placed on three years of post-release control.

26.

{¶ 49} Woods violated the conditions of his post-release control multiple times in the eight months following his release. He ultimately admitted to the violations alleged at a March 30, 1998 violation hearing and was ordered to serve a 150-day prison term – 50% of his original term. After being released from that sanction, Woods again violated the conditions of his post-release control and was ordered to serve an additional 30 days in jail at a March 25, 1999 violation hearing.

{¶ 50} After that second violation hearing, Woods filed a writ of habeas corpus in the 6th District Court of Appeals requesting his immediate release. He argued that the imposition of post-release control was a violation of the separation-of-powers doctrine because it provided the APA with the authority to render a finding of guilt and impose sentence for his violations – powers reserved to the judiciary in the Ohio Constitution. This court found that R.C. 2967.28 violated the separation-of-powers doctrine because it impeded the administration of justice by the judiciary branch. *Id.* at 511. The Lucas County Sheriff, respondent to the habeas petition, appealed that decision to the Ohio Supreme Court.

{¶ 51} On appeal, the Ohio Supreme Court reversed and held that the statute was constitutional. The court stated "[u]nder the current system of post-release control, the judge sentences the offender from the options available under the new sentencing scheme and informs the offender that he or she may be subject to a definite period of post-release control[.]" *Id.* at 511. The trial court is also required to notify the offender that a violation of the conditions of post-release control would result in an additional prison

27.

term up to the statutory cap of 50% of the original term imposed. *Id.* Therefore, "unlike bad time, where a crime committed while incarcerated resulted in an additional sentence not imposed by the court * * * [t]he offender is fully informed at sentencing that violations of post-release control will result in [an additional prison term up to the statutory cap]." As a result, the Ohio Supreme Court held that the post-release control system created under R.C. 2967.28 did not violate the separation-of-powers doctrine.

{¶ 52} In addition to the general overview of the separation-of-powers issue applicable to the present appeal, *Woods* provides a clear example from the Ohio Supreme Court of the three-way sharing among the legislative, judicial, and executive branches regarding felony sentencing as described in *Mistretta*. At Woods's March 30, 1997 sentencing on his initial post-release control convictions, he was ordered to serve an additional prison term of 150 days. This constituted 50% of his original sentence. After completing that sentence, Woods again violated the conditions of his post-release control and, on March 25, 1999, was ordered to serve an additional 30 days in jail – resulting in a combined period of confinement which exceeded 50% of his original sentence.

{¶ 53} In his habeas petition, Woods argued that the additional 30 days, which combined with the 150 days previously imposed, exceeded the statutory cap that limited prison terms for post-release control to 50% of the original term imposed. The Ohio Supreme Court agreed and, despite finding that the post-release control statute did not violate the separation-of-powers doctrine, held that the imposition of a term beyond the 50% cap identified in the statute violated the law and warranted Woods's immediate

28.

release from incarceration. *Woods*, therefore, plainly reveals that Ohio has incorporated the *Mistretta* three-way sharing model for felony sentencing. That is, the General Assembly establishes the range of available sentences, the judiciary elects a sentence within the range established by the legislature up to the maximum authorized by statute, and the executive branch ultimately determines which portion of the maximum sentence an offender serves. It is only when a branch of government – in this case, the judiciary – exceeds the authority granted to it under that division of power that the sentence is rendered invalid. Importantly, it is a branch's act of exceeding its authority granted under the *Mistretta* division that renders the sentence invalid under the separation-of-powers doctrine, not the sentencing scheme itself.

{¶ 54} In the present appeal, appellant challenges only the sentencing scheme itself, arguing that any executive branch order to serve the indefinite portion of his sentence violates the separation-of-powers doctrine. We find that the analysis utilized in *Woods* to describe the manner in which post-release control does not result in the executive branch's usurpation of judicial authority is equally applicable to sentences imposed under the Reagan Tokes Law. Under the current indeterminate sentencing scheme, the trial court must impose a minimum and maximum prison term. R.C. 2929.14. At sentencing, the offender is informed that it is presumed he or she will be released at the conclusion of the minimum term unless ODRC rebuts that presumption based on certain factors described in the statute. R.C. 2967.271.

29.

{¶ 55} Here, it is evident that the sentencing judge selected a sentence from the options available under the Reagan Tokes Law and informed appellant of those minimum and maximum terms at the time of sentencing. Therefore, appellant is fully informed of the entire prison term he might be obligated to serve *at the time of sentencing.* Importantly, there is nothing in the Reagan Tokes Law that permits ODRC to extend an offender's prison term beyond the maximum imposed by the court at sentencing. As a result, a sentence imposed under the Reagan Tokes Law establishes the parameters under which appellant may be ordered to serve the indefinite portion of his prison term up to the maximum statutory cap, a sentencing framework which was deemed constitutional in *Woods.*

{¶ 56} In sum, the post-release control system in Ohio is analogous to an indeterminate sentence imposed under the Reagan Tokes Law in that at the time of sentencing the offender is advised of the minimum prison term they *will serve* as well as the maximum prison term they *might serve*. The discretion of an executive branch agency to determine what portion of that sentence the offender will ultimately serve does not usurp the judiciary's constitutional power to impose that sentence. For these reasons, *Woods* is instructive in resolving appellant's separation-of-powers argument in the present appeal.

C. Parole

{¶ 57} Having found the Reagan Tokes Law's sentencing scheme distinct from Ohio's former bad time statute but analogous with Ohio's post-release control sentencing

30.

structure, we now turn to Ohio's parole system and prior authority reviewing it, and find that this authority provides further guidance as to the constitutionality of the Reagan Tokes Law under a separation-of-powers challenge. Ohio's parole system is governed under R.C. 2967.01 *et seq.* Similar to a sentence imposed under the Reagan Tokes Law, the parole system allows an offender to be released from prison prior to serving the maximum sentence imposed by the trial court. R.C. 2967.13(A) and (B) define which offenders are eligible for release through parole. Parole is granted at the discretion of the APA pursuant to R.C. 2967.02(A).

{¶ 58} While the parole system is procedurally distinguishable from the sentencing scheme under the Reagan Tokes Law (as discussed below), challenges to the system as a violation of the separation-of-powers doctrine is instructive to the present appeal. Separation-of-powers arguments have been raised against the original establishment of parole and after each subsequent modification to parole. Ohio courts have consistently found that determining parole eligibility is a non-judicial function properly exercised by the executive branch. *See Budd v. Kinelka,* 10th Dist. No. 01AP-1478, 2002-Ohio-4311, ¶ 15 (holding that "the act of determining parole is not a judicial function but is purely executive in nature"); *Rose v. Haskins,* 388 F.2d 91 (6th Cir.1968) ("It is axiomatic that the administration of the state's penal system is exclusively a state function under the reserved powers in the Constitution. The state may thus enact legislation defining what conduct constitutes a crime and fixing the sentence to be imposed * * * [and] the execution of the sentence is within the authority of the state's

31.

executive department."); *State ex rel. Blake v. Shoemaker,* 4 Ohio St.3d 42, 446 N.E.2d 169 (1983); *Woods* at 511 ("Under [Ohio's parole system] a sentencing judge imposing an indefinite sentence with the possibility of parole, had limited authority to control the minimum time to be served before the offender's release on parole; the judge could control the maximum length of the prison sentence, but the judge had no power over when parole might be granted in between those parameters. * * * [F]or as long as parole has existed in Ohio, the executive branch * * * has had absolute discretion over that portion of an offender's sentence."). The consistent thread in each of these decisions is that parole decisions are exclusive to the APA despite the power to sentence offenders being reserved to the judiciary. Compared with the Reagan Tokes Law, there appears to be no difference as the sentence in both instances is imposed by the trial court and the carrying out of that sentence is handled by the executive branch.

{¶ 59} Put simply, provided that the trial court imposes the maximum sentence, the executive branch does not violate the separation-of-powers doctrine by merely enforcing the sentence imposed by the trial court. In this way, the parole scheme is similar to Ohio's post-release control system, which was held constitutional in *Woods*. Likewise, the Reagan Tokes Law sentencing structure is similar to both parole and post-release control in terms of the sharing of authority among the three branches. Sentences imposed under the Reagan Tokes Law comply with this *judicially-imposed but executively-enforced* structure. Thus, the Ohio Supreme Court's approval of the parole

32.

system's constitutionality against a separation-of-powers challenge is persuasive authority as to the Reagan Tokes Law's constitutionality.

### 4. Conclusion – Reagan Tokes Law does not Violate the Separation-of-Powers Doctrine

{¶ 60} Under the Reagan Tokes Law's sentencing scheme, the trial court imposes a minimum and maximum prison term for certain categories of offenses. While it is presumed that the offender will be released at the conclusion of the minimum term, ODRC may rebut that presumption and order the offender to serve the indefinite portion of the term up to the maximum imposed. The Ohio Supreme Court has consistently rejected separation-of-powers challenges to statutes that require the trial court to impose a maximum prison term at the time of sentencing while permitting the executive branch to determine which portion of that sentence will ultimately be served, so long as the term to be served does not exceed the stated maximum. The Reagan Tokes Law mirrors this constitutionally permitted sentencing structure. Therefore, we find that the Reagan Tokes Law does not violate the separation-of-powers doctrine.

### D. Due Process of Law

{¶ 61} Having found that the Reagan Tokes Law does not violate the separation-of-powers doctrine, I now turn to appellant's due process argument. As previously noted, appellant contends that he has a liberty interest in being free from confinement at the expiration of his minimum term, and that this interest is not adequately protected under the Reagan Tokes Law. Appellant argues that due process in this context requires, at a minimum, certain basic procedural safeguards including (1) a trial, (2) findings of fact

33.

and determination of guilt by a jury, and (3) representation of counsel, including appointed counsel. Appellant contends that the Reagan Tokes Law deprives him of his due process rights because it does not afford him any of these safeguards, and thus the Reagan Tokes Law is unconstitutional on its face.

### 1. Historical Development of Due Process Rights in Post-Sentencing Cases

{¶ 62} Before analyzing the merits of appellant's particular due process arguments, it is necessary to review the historical development of due process rights in post-sentencing cases.

{¶ 63} "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). Here, appellant claims that he has been deprived of a liberty interest. Such an interest may arise (1) from the United States Constitution itself, (2) by reason of guarantees implicit in the word "liberty," or (3) from an expectation or interest created by state laws or policies. *Id.* With that in mind, we now turn to an examination of the case law addressing due process challenges in post-sentencing criminal cases like the case presently before us.

{¶ 64} At the outset, it should be noted that the due process protections afforded a defendant under the Ohio Constitution are coextensive with the due process protections guaranteed under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *State v. Anderson*, 148 Ohio St.3d 74, 2016-Ohio-5791, 68 N.E.3d

34.

790, ¶ 21.  As such, "we can rely on decisions of both [the Ohio Supreme Court] and the United States Supreme Court" in construing the defendant's due process rights.  *Id.* at ¶ 23.  I will therefore begin by reviewing relevant case law from the United States Supreme Court.  I will then briefly review select Ohio case law.

A.  United States Supreme Court Cases

{¶ 65} Long ago, the United States Supreme Court recognized the difficulty inherent in sharply defining the term "due process" as it is used in the United States Constitution.  Indeed, in *Dent v. West Virginia*, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889), the court recognized:

> As we have said on more than one occasion, it may be difficult, if not impossible, to give to the terms 'due process of law' a definition which will embrace every permissible exertion of power affecting private rights, and exclude such as are forbidden. They come to us from the law of England, from which country our jurisprudence is to a great extent derived; and their requirement was there designed to secure the subject against the arbitrary action of the crown, and place him under the protection of the law. They were deemed to be *124 equivalent to 'the law of the land.' In this country the requirement is intended to have a similar effect against legislative power; that is, to secure the citizen against any arbitrary deprivation of his rights, whether relating to his life, his liberty, or his property. * * * The

35.

great purpose of the requirement is to exclude everything that is arbitrary and capricious in legislation affecting the rights of the citizen.

*Id.* at 123-24.

{¶ 66} Over time, the United States Supreme Court and inferior courts following it have further developed the law with respect to due process in areas involving the deprivation of a defendant's liberty arising out of criminal prosecution and subsequent incarceration. In that arena, the court reiterated what it had previously said in *Dent*, namely that "[t]he touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), citing *Dent* at 123.

{¶ 67} In order to ensure that an act of government is not arbitrary, and thus in violation of due process protections, the United States Supreme Court has, as set forth in greater detail below, established a two-part test that looks first at whether due process applies and then, if so, considers what process is due. The court has stressed that courts must be flexible when applying this test. In its decision in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 333 L.Ed.2d 484 (1972), the court stated:

> Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands.
>
> '(C)onsideration of what procedures due process may require under any

36.

given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure.

*Id.* at 481.

{¶ 68} The court expounded further on the need for flexibility when it issued its decision in *Wolff* two years after *Morrissey*. In *Wolff*, the court stated:

We have often repeated that '(t)he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' '(C)onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' Viewed in this light it is immediately apparent that one cannot automatically apply procedural rules designed for free citizens in an open society, or for parolees or probationers under only limited restraints, to the very different

situation presented by a disciplinary proceeding in a state prison. (Citations omitted.)

*Wolff* at 560; *see also Vitek v. Jones*, 445 U.S. 480, 499-500, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (Powell, J., concurring) ("Our decisions defining the necessary qualifications for an impartial decisionmaker demonstrate that the requirements of due process turn on the nature of the determination which must be made. * * * The essence of procedural due process is a fair hearing.").

{¶ 69} The court in *Wolff*, a prison disciplinary case, went on to note the "great unwisdom" inherent in

encasing the disciplinary procedures in an inflexible constitutional straitjacket that would necessarily call for adversary proceedings typical of the criminal trial, very likely raise the level of confrontation between staff and inmate, and make more difficult the utilization of the disciplinary process as a tool to advance the rehabilitative goals of the institution.

*Id*. at 563.

{¶ 70} Notwithstanding this precedent and its emphasis upon the need for flexibility, appellant argues that due process in this case requires the provision of the following procedural safeguards during additional term hearings conducted under the Reagan Tokes Law: (1) a trial; (2) findings of fact and determination of guilt by a jury; and (3) representation of counsel, including appointed counsel.

38.

{¶ 71} Against this backdrop, I turn to the specific arena in which appellant's due process argument is raised, requiring us to determine whether the presumptive release provisions of the Reagan Tokes Law are more akin to parole *release* or parole *revocation*. I am guided in my determination on this issue by the words of Judge Henry Friendly, who "cogently noted that 'there is a human difference between losing what one has and not getting what one wants.'" *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 10, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), quoting Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1296 (1975).

{¶ 72} In its decision in *Morrissey*, the United States Supreme Court set forth some general due process principles in the context of a challenge to the constitutionality of parole revocation procedures in Iowa. Initially, the court distinguished between parole revocation proceedings and criminal prosecutions, where the defendant is entitled to the "full panoply" of due process rights. *Id.* at 480. The court explained that the criminal prosecution concludes with the imposition of sentence, and reasoned that the revocation of parole was not part of the criminal prosecution since it took place after the sentence was imposed by the trial court. *Id.* As such, the court found that the liberty interest at stake in a revocation proceeding was not the "absolute liberty to which every citizen is entitled, but only * * * the conditional liberty properly dependent on observance of special parole restrictions." *Id.*

{¶ 73} Thereafter, the court articulated a two-part analysis to be applied to due process challenges like the one at issue in the present case. First, the court examined

39.

whether due process applies at all. This examination required the court to consider the "extent to which an individual will be 'condemned to suffer grievous loss.'" *Id.* at 481, quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). The question here was whether the nature of the interest at stake was within the meaning of the "liberty or property" language of the Fourteenth Amendment. *Id.*, citing *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

{¶ 74} If due process applies, the analysis moves to the second step, in which it must be determined "what process is due." *Id.* In connection with step two of the analysis, the court in *Morrissey* cautioned that "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.*

{¶ 75} After setting forth the two-step analytical framework above, the court examined the nature of the parolee's interest in his continued liberty to determine whether due process applied. The court observed that the liberty of the parolee is "very different from that of confinement in prison" given that such liberty permits the parolee to live a "relatively normal life" as a "responsible, self-reliant person." *Id.* at 482. Because a parolee's liberty is, in many ways, very similar to the unqualified liberty of one who is not subject to parole, the court found that it is within the protection of the Fourteenth Amendment. *Id.* Moreover, the court found that the revocation of parole, and thus the termination of the parolee's liberty, "calls for some orderly process, however informal." *Id.*

40.

**{¶ 76}** In evaluating what process was required in order to deprive the parolee of his conditional liberty interest through the revocation of parole, the court began by recognizing: "Given the previous conviction and the proper imposition of conditions, the State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole." *Id.* at 483. Nonetheless, the state may not revoke parole without certain procedural guarantees, including "an informal hearing structured to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." *Id.* at 484. The court ultimately specified that the minimum requirements of due process pertaining to parole revocation include

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Id.* at 489.

41.

{¶ 77} The court then emphasized that "there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense." *Id.* Further, the court noted that it was not reaching or deciding the question of whether the parolee was entitled to the assistance of retained or appointed counsel at the revocation hearing. *Id.*

{¶ 78} Less than one year after *Morrissey* was decided, the United States Supreme Court issued its decision in *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). There, Scarpelli, a felony probationer, was arrested after committing a burglary. He subsequently admitted his involvement in the burglary and his probation was revoked without a hearing and without Scarpelli having the benefit of counsel. Scarpelli challenged the revocation of his probation by filing a habeas petition.

{¶ 79} The case ultimately made its way to the United States Supreme Court, which held that probationers like Scarpelli are entitled to a preliminary and revocation hearing under the same conditions as it set forth for parolees in *Morrissey*. *Id*. at paragraph one of the syllabus. Indeed, the court found that there is no difference between parole and probation in terms of due process rights that must be afforded prior to revocation, and stated that "[p]robation revocation, like parole revocation, is not a stage of a criminal prosecution, but does result in a loss of liberty." *Id*. at 782.

{¶ 80} Thereafter, the court addressed the "more difficult" issue it had previously refused to consider in *Morrissey*, namely whether an indigent probationer has a due process right to appointed counsel during revocation hearings. Ultimately, the court found that this determination must be made on a case-by-case basis by the body holding

42.

the hearings. *Id.* at paragraph two of the syllabus. To aid in this process, the court explained;

> Though the State is not constitutionally obliged to provide counsel in all cases, it should do so where the indigent probationer or parolee may have difficulty in presenting his version of disputed facts without the examination or cross-examination of witnesses or the presentation of complicated documentary evidence. Presumptively, counsel should be provided where, after being informed of his right, the probationer or parolee requests counsel, based on a timely and colorable claim that he has not committed the alleged violation or, if the violation is a matter of public record or uncontested, there are substantial reasons in justification or mitigation that make revocation inappropriate.

*Id.*

{¶ 81} While *Morrissey* and *Gagnon* dealt with due process arguments raised by defendants who were already released from confinement, either on parole or probation, the next decision issued by the United States Supreme Court, *Greenholtz*, involved a due process challenge raised by a defendant who was denied parole at his initial suitability hearing. I find that this initial suitability hearing is the closest analog to the additional term hearing held under the Reagan Tokes Law and challenged by appellant (and others who have raised similar due process challenges to the Reagan Tokes Law). Consequently, examination of the *Greenholtz* decision warrants careful consideration.

43.

{¶ 82} In *Greenholtz,* inmates of a Nebraska prison brought a civil rights class action against the Nebraska State Board of Parole and others, alleging due process violations in the Board's consideration of the inmates' suitability for parole. The matter eventually made its way to the United States Supreme Court, which granted certiorari "to decide whether the Due Process Clause of the Fourteenth Amendment applies to discretionary parole-release determinations by the [Board], and, if so, whether the procedures the Board currently provides meet constitutional requirements." *Id*. at 3.

{¶ 83} At the beginning of its decision, the court reviewed the familiar framework of Nebraska's parole statutes, which provided for both mandatory and discretionary (yet presumptive) parole. An inmate serving an indefinite prison sentence consisting of a minimum and maximum term became eligible for parole upon completion of the minimum term, and was entitled to mandatory parole upon completion of the maximum term. *Id.* at 4. Only discretionary parole was at issue in *Greenholtz. Id.*

{¶ 84} Under preexisting procedures established partly by the Nebraska legislature via state statutes and partly by the Nebraska State Board of Parole via regulations, an initial parole review hearing and a final review hearing was conducted prior to the release of an eligible inmate on discretionary parole. *Id.* At the initial hearing, the Board reviewed the inmate's preconfinement and postconfinement record, interviewed the inmate, and considered any letters or statements the inmate wished to present in support of his release. *Id.* No evidence was presented at the initial hearing. *Id.* At the conclusion of the initial hearing, the Board would determine whether the inmate was a

44.

likely candidate for parole. If not, the Board would deny parole, inform the inmate of the basis for its denial or parole, and make recommendations to the inmate as to how he could remedy the deficiencies observed by the Board. *Id.* at 5.

{¶ 85} If the Board determined that the inmate was a likely candidate for release on parole, it would schedule a final hearing and notify the inmate of the date and time of the hearing. At the final hearing, the inmate was permitted to present evidence, call witnesses and be represented by retained counsel. *Id.* The inmate was not permitted to hear adverse testimony or conduct cross examination of witnesses providing such testimony. *Id.* If, after the final hearing, the Board denied parole, it was required to furnish a written statement of its reasons for such denial to the inmate within 30 days. *Id.*

{¶ 86} Following its articulation of the statutory framework at issue, the court began its analysis by articulating generic due process considerations. Of note here, the court explained that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Id.* at 7. The court went on to explain that one who has not yet been convicted of a criminal offense shares the same desire to be free from confinement as one who is presently in confinement and wishes to be released. *Id.* Nonetheless, the former individual has a liberty interest in being free from confinement, whereas the latter individual has already had that liberty interest extinguished by virtue of a criminal conviction and its attendant procedural safeguards. *Id.*

45.

{¶ 87} The court further explained that decisions of the executive branch, in this case the Nebraska State Board of Parole, "do not automatically invoke due process protection; there simply is no constitutional guarantee that all executive decisionmaking must comply with standards that assure error-free determinations. * * * This is especially true with respect to the sensitive choices presented by the administrative decision to grant parole release." *Id.*

{¶ 88} Thereafter, the court considered two alternative arguments advanced by the inmates as to why they were entitled to due process protections not afforded them by Nebraska's parole suitability procedures. First, the inmates argued that Nebraska's creation of the *possibility* of parole gave rise to a reasonable entitlement to due process. The inmates relied heavily upon the court's prior decision in *Morrissey* to support their first argument. The court found the inmates' reliance upon *Morrissey* misplaced in light of the fact that "parole *release* and parole *revocation* are quite different." (Emphasis sic.). *Id.* at 9.

{¶ 89} The court went on to observe a "crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires." *Id.* Unlike the parolees in *Morrissey* and probationers in *Gagnon*, who were already released from prison and therefore "at liberty," the court observed that the inmates were still confined and "thus subject to all of the necessary restraints that inhere in a prison." *Id.* Further, the court distinguished parole release from parole revocation by noting the different nature of the decision that must be made in each case. Unlike parole revocation,

46.

where the reviewing body's concern is "wholly retrospective," the parole release decision is

> more subtle and depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release. Unlike the revocation decision, there is no set of facts which, if shown, mandate a decision favorable to the individual. The parole determination, like a prisoner-transfer decision, may be made "for a variety of reasons and often involve[s] no more than informed predictions as to what would best serve [correctional purposes] or the safety and welfare of the inmate." *Meachum v. Fano*, 427 U.S., at 225, 96 S.Ct., at 2538.

*Id*. at 9-10.

{¶ 90} In sum, the court found that, where parole release in general is concerned, the state merely holds out the possibility of parole and thus "provides no more than a mere hope that the benefit will be obtained." *Id.* at 11, citing *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Simply put, "the general interest asserted here is no more substantial than the inmate's hope that he will not be transferred to another prison, a hope which is not protected by due process." *Id*., citing *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

47.

**{¶ 91}** Second, the inmates argued in the alternative that they were entitled to certain due process rights because the language employed in the Nebraska statutes created an expectation of parole. In particular, the inmates pointed to statutory language that stated:

> Whenever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it shall order his release unless it is of the opinion that his release should be deferred because:
>
> (a) There is a substantial risk that he will not conform to the conditions of parole;
>
> (b) His release would depreciate the seriousness of his crime or promote disrespect for law;
>
> (c) His release would have a substantially adverse effect on institutional discipline; or
>
> (d) His continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance his capacity to lead a law-abiding life when released at a later date.

*Id.*, quoting Neb.Rev.Stat. § 83-1,114(1).

**{¶ 92}** According to the inmates, this statutory language "creates a presumption that parole release will be granted, and that this in turn creates a legitimate expectation of release absent the requisite finding that one of the justifications for deferral exists." *Id.* at 12. The court agreed, and found that the expectancy of release provided in the foregoing

48.

statute entitled the inmates to "some measure of constitutional protection."[8]  *Id.*  In other words, the presumption in favor of parole release under Nebraska law created a separate liberty interest requiring some due process.[9]  What remained for the court was to identify what specific process was due.

{¶ 93} Turning to that issue, the court began by stressing the rehabilitative purpose of parole and the need for flexible, non-adversarial proceedings in order to accommodate that purpose.  Because the parole release decision was one that was made largely on the basis of the inmate's files, the court found that the protections afforded to inmates during the initial hearing, including the Board's mandatory consideration of the inmate's entire record and the opportunity of the inmate to present letters and statements on his own behalf, adequately protected inmates against serious risks of error and satisfied due process.  *Id.* at 15.  Summing up its decision, the court stated: "The Nebraska procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in

---

[8] The United States Supreme Court abrogated this liberty interest analysis in the context of cases involving due process arguments regarding changes in prison conditions for inmates in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).  It is unclear, however, whether this framework still remains valid for other types of cases more factually akin to *Greenholtz*, such as parole suitability.  For purposes of my analysis below, and since it inures to appellant's benefit, I will apply this framework, rather than the more stringent framework set forth in *Sandin,* in my analysis of whether appellant has demonstrated a liberty interest.

[9] The court noted the unique structure of the Nebraska parole system and emphasized that "whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis."  *Greenholtz* at 12.

49.

what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances. The Constitution does not require more." *Id*. at 16.

{¶ 94} Ten months after *Greenholtz* was decided, the United States Supreme Court issued its decision in *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). In this case, which is heavily cited by appellant in his brief, a prisoner leveled a procedural due process constitutional challenge against a Nebraska statute allowing the Director of Correctional Services to transfer a prisoner to a mental hospital if a physician or psychologist found the prisoner suffered from a mental disease that could not be properly treated in prison. The federal District Court found the involuntary transfer statute unconstitutional, and the matter proceeded to the United States Supreme Court.

{¶ 95} The court in *Vitek* reviewed the involuntary transfer statute and concluded that it implicated a liberty interest that was protected under the Fourteenth Amendment's Due Process Clause. *Id*. at 490-91. The court explained that an inmate's transfer to a mental hospital carried with it certain "adverse social consequences" that "can have a very significant impact on the individual." *Id*. at 492. Although the prisoner challenging the law had already been convicted and confined, thereby extinguishing his liberty interest to be free from confinement, the court found that the transfer from prison to a mental hospital constituted a change in confinement with consequences that were "qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Id*. at 493. The court went on to explain: "A criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from

50.

confinement for the term of his sentence, but they do not authorize the State to classify him as mentally ill and to subject him to involuntary psychiatric treatment without affording him additional due process protections." *Id.* at 493-94.

{¶ 96} Once the court found that the prisoner was entitled to some due process protection, it moved on to the issue of what process was required. Ultimately, the court adopted most of the procedures articulated by the District Court, including written notice of the transfer request, a hearing with disclosure of the basis for the transfer and an opportunity to be heard and present evidence, an opportunity (with some exceptions) at the hearing to present testimony of witnesses and to cross-examine witnesses called by the state, an independent decisionmaker, a written statement by the factfinder as to the evidence relied on and the reasons for transferring the prisoner, and effective and timely notice of all the foregoing rights.[10] *Id*. at 494-95.

{¶ 97} Since *Vitek*, the United States Supreme Court has released at least two decisions addressing due process arguments raised by prisoners who wish to challenge changes to their conditions of confinement. *See Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (finding no liberty interest protecting against a 30-day assignment to segregated confinement), and *Wilkinson v. Austin*, 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (finding a liberty interest protecting against

---

[10] Four of the justices would also have upheld the District Court's requirement that the state provide access to appointed counsel for indigent prisoners. The provision of mandatory appointed counsel did not garner the support of a majority of the justices, and is thus not required under the court's decision in *Vitek*. *Id*. at 497.

51.

assignment to an Ohio "Supermax" prison, but finding state policy provides a sufficient level of process to survive constitutional scrutiny). The liberty interest at issue in these cases, namely the interest to have one's confinement conditions maintained, is distinct from the liberty interest at issue in the present case, which appellant identifies as the interest to be free from confinement altogether. Thus, I need not address cases in *Vitek's* progeny, which develop the case law as to what process is due to defendants who are subject to changes in their conditions of confinement. Indeed, the court in *Wilkinson* recognized this distinction, stating:

> Ohio is not, for example, attempting to remove an inmate from free society for a specific parole violation, * * * or to revoke good-time credits for specific, serious misbehavior, * * * where more formal, adversary-type procedures might be useful. Where the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in *Greenholtz*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668, and *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), provide the appropriate model.

*Wilkinson* at 228-29.

{¶ 98} Over three decades after it decided *Vitek*, the United States Supreme Court took up a case involving a challenge to California's parole suitability statutes. In *Swarthout v. Cooke*, 562 U.S. 216, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011), the court

52.

considered the merits of a habeas petition filed by a convicted murderer, Damon Cooke, who was denied parole after serving 12 years of his indeterminate prison sentence of seven years to life. *Id.* at 217.

{¶ 99} The California parole statute in effect at the time, Cal.Penal Code Ann. 3041(b), required the Board to "set a release date unless it determines that * * * consideration of the public safety requires a more lengthy period of incarceration." If parole was denied, a prisoner could seek judicial review via a state habeas petition. Under then-existing California Supreme Court case law, such petitions were reviewed to determine whether "some evidence" supports the conclusion that the inmate is dangerous and thus unsuitable for parole. *Id.*

{¶ 100} In its decision denying parole, the California Board of Prison Terms found that Cooke was not yet suitable for parole due to the heinous nature of his crime, his failure to fully participate in rehabilitative programs while in prison, his failure to develop marketable skills, and several incidents of misconduct while in prison. *Id.* Cooke filed a habeas petition with a California trial court, which denied the petition upon a finding that there was some evidence to support the Board's denial. *Id.* That decision was affirmed on appeal.

{¶ 101} Cooke then filed another habeas petition in federal District Court. The District Court also denied Cooke's petition. However, the Ninth Circuit reversed, finding that California's parole statute and the "some evidence" requirement that was read into

53.

the statute by the California Supreme Court created a liberty interest protected by the Due Process Clause. *Id*. at 218.

{¶ 102} As the United States Supreme Court reviewed the propriety of federal habeas relief granted by the Ninth Circuit, it recognized that Cooke had a state liberty interest in receiving parole when the California standards for parole have been met, which it found in the California parole statute and its interpretation by the California Supreme Court. *Id*. at 220. The court then moved to a consideration of what process was required in connection with that liberty interest. *Id*. Relying upon its prior decision in *Greenholtz*, the court stated that "[i]n the context of parole, we have held that the procedures required are minimal." *Id*. Specifically, the procedures required include (1) an opportunity to be heard and (2) a statement of the reasons why parole is denied. *Id*., citing *Greenholtz* at 16.

{¶ 103} The court found that Cooke was afforded the necessary procedures in state court, noting that Cooke was allowed to speak at his parole hearing and contest the evidence against him, was afforded access to the state's records, and was notified as to the reasons why his parole was denied. *Id*. Therefore, the court found that the Ninth Circuit improperly reversed the decision of the District Court denying Cooke's habeas petition.

B. Select Ohio Case Law

{¶ 104} The foregoing cases establish the constitutional framework set forth by the United States Supreme Court for evaluating appellant's due process challenge to the

54.

Reagan Tokes Law. Next, I will address how Ohio courts have handled similar due process claims, beginning with the relevant decisions issued by the Ohio Supreme Court prior to the General Assembly's passage of the Reagan Tokes Law. I will then examine how other Ohio intermediate appellate courts have addressed due process challenges to the Reagan Tokes Law itself.

{¶ 105} I begin my review of the relevant case law from the Ohio Supreme Court with *Woods*, *supra*, 89 Ohio St.3d 504, 733 N.E.2d 1103 (2000), which was discussed above in the analysis of appellant's separation-of-powers argument. After holding that the APA's authority to impose a prison term following violations of conditions of post-release control did not violate the separation-of-powers doctrine, the court in *Woods* reviewed this court's finding that the APA's post-release control procedures did not afford Woods with the necessary due process under *Morrissey* and its progeny. Upon its consideration, the court disagreed with our finding and held that the procedures afforded Woods did not violate his due process rights.

{¶ 106} In particular, the court considered the statutory obligation placed upon the APA to ensure procedural due process to an alleged violator, and also took into consideration the relevant administrative regulations that had been promulgated to ensure such procedural due process. *Id.* at 513. The regulations afforded Woods the right to (1) written notice of the violations he was alleged to have committed, (2) a hearing at which he could present witnesses and evidence, (3) cross-examination of witnesses (subject to some exceptions), (4) disclosure of the evidence against him, (5) representation of counsel (appointed counsel if indigent), and (6) access to a written digest of the proceedings by the hearing officer. *Id.* at 513-14. The court briefly reviewed the United States Supreme Court's decision in *Morrissey*. Ultimately, the court construed the due process requirements articulated in *Morrissey* as limited to the provision of a neutral and

56.

detached decision-maker. *Id.* at 514. Since the APA assigned a hearing officer other than Woods' parole officer to preside over the post-release control violation hearing and render a decision, the court rejected Woods' due process argument. *Id.*

{¶ 107} Several years prior to its decision in *Woods*, the Ohio Supreme Court issued a decision in a case involving parole. In *Shoemaker*, *supra*, 4 Ohio St.3d 42, 446 N.E.2d 169 (1983), the court briefly reviewed the dismissal of a mandamus action filed by an inmate who had been denied parole by the APA and argued that he was denied minimal due process rights in his parole hearing. In particular, the inmate argued that the parole statute in effect at the time, R.C. 2967.03, created a liberty interest sufficient to establish his right to procedural due process. *Id.* at 42.

{¶ 108} The court briefly reviewed the parole statute, which provided that the APA *may* grant parole to a prisoner "if in its judgment there is a reasonable ground to believe that if * * * the prisoner is paroled, such action would further the interests of justice and be consistent with the welfare and security of society." *Id.* at 42-43. Noting the language used, the court characterized the statute as a "grant of discretion," and found that "it does not create any presumption that parole will be issued and does not create an expectancy of parole upon which appellant can base his due process claim." *Id.* at 43. Citing to the United States Supreme Court's decision in *Greenholtz*, the court rejected the inmate's contention that the statute created a liberty interest triggering procedural due process, and affirmed the dismissal of the mandamus action. *Id.*

57.

{¶ 109} Importantly, the discretionary form of parole at issue in *Shoemaker* is distinguishable from the presumptive parole enacted under the Reagan Tokes Law, wherein an inmate is *presumed* to be entitled to release upon completion of the minimum term. This distinction is meaningful, for the existence of the liberty interest found in *Greenholtz* hinged upon the fact that Nebraska's parole statutes set forth a presumptive entitlement to parole, like the Reagan Tokes Law, and not a wholly-discretionary parole system.

{¶ 110} More recently, the Ohio Supreme Court issued a decision in a mandamus action brought by several inmates who were denied parole by the APA. In *State ex rel. Bailey v. Ohio Parole Board*, 152 Ohio St.3d 426, 2017-Ohio-9202, 79 N.E.3d 433 (2017), the inmates argued that the APA had an "unwritten policy of denying parole to old-law offenders" based upon statements made by board members that those who remained on parole were the worst inmates and those who were suitable for parole had likely already been released. *Id.* at 426.

{¶ 111} The court began its analysis by citing to *Greenholtz* and noting that inmates have "no constitutional right to parole release before the expiration of his sentence." *Id.* at 428, citing *Greenholtz* at 7; *see also State ex rel. Miller v. Leonard*, 88 Ohio St.3d 46, 47, 723 N.E.2d 114 (2000) ("There is no constitutional or inherent right to be released before the expiration of a valid sentence."). Further, the court explained that the APA has broad discretion in parole matters. *Id.*, citing *Layne v. Ohio Adult Parole Auth.*, 97 Ohio St.3d 456, 2002-Ohio-6719, 780 N.E.2d 548, ¶ 28. Nonetheless, the court

58.

expressed that the APA's discretion is not unlimited, since the Ohio Revised Code creates an expectation that inmates would receive meaningful consideration for parole. *Id.*, citing *Layne* at ¶ 27. The court explained that the principle of meaningful consideration is violated when, for example, the inmate's parole eligibility is determined based upon an offense category score that does not correspond to the actual offense committed by the inmate or upon information in an inmate's file that is substantively incorrect. *Id.*, citing *Layne* at ¶ 27 and *State ex rel. Keith v. Ohio Adult Parole Auth.*, 141 Ohio St.3d 375, 2014-Ohio-4270, 24 N.E.3d 1132, ¶ 23 ("Requiring the board to consider specific factors to determine the inmate's fitness for release would not mean anything if the board is permitted to rely on incorrect, and therefore irrelevant, information about a particular candidate.").

{¶ 112} The court then applied these principles to the facts before it, and concluded that the inmates had failed to state a claim for relief in mandamus. The court noted that the APA did not base its parole decision on factually inaccurate information or hold the inmates to account for crimes more serious than the ones they actually committed, including murder and involving a minor in nudity material. *Id.* Instead, the APA properly exercised its discretion in assigning the weight it deemed appropriate to the seriousness of the inmates' offenses. In upholding that exercise of discretion, the Ohio Supreme Court stated: "So long as each assessment rests on correct facts and falls within permissible guidelines, an inmate has no basis to challenge the decision." *Id*. at 429.

59.

{¶ 113} In short, the court in *Bailey* recognized a liberty interest in parole flowing from the structure of the parole statute, but held that the APA provided the necessary procedural due process to the inmates. The recognition of a liberty interest was already settled law by the time *Bailey* was issued. Indeed, the court stated three years earlier concerning the parole statute: "[H]aving set up the system and defined at least some of the factors to be considered in the parole decision, the state has created a minimal due-process expectation that the factors considered at a parole hearing are to be as described in the statute or rule and are to actually and accurately pertain to the prisoner whose parole is being considered." *Keith*, *supra*, at ¶ 25. Thus, in the parole context, the real issue was whether the APA provided the requisite process, not whether the inmates had a protected liberty interest. Further, the challenge at issue was an as-applied challenge, not a facial one.

### ii. Ohio Appellate Decisions Addressing Due Process Arguments Under Reagan Tokes Law

{¶ 114} I have thus far provided a general overview of the legal landscape concerning due process in the context of probation, parole, and post-release control, derived from decisions issued by the United States Supreme Court and the Ohio Supreme Court. Given its relatively recent passage, the Reagan Tokes Law has not been evaluated by either of these courts for due process conformity. However, the due process question has been addressed by other intermediate appellate courts in Ohio. Thus, I now turn my attention to some of those decisions.

60.

**{¶ 115}** In *Ferguson*, *supra*, 2d Dist. Montgomery No. 28644, 2020-Ohio-4153, the Second District considered the question of whether the Reagan Tokes Law passes constitutional muster under the Due Process Clause. There, the court began its due process analysis by emphasizing "'[t]he fundamental requisite of due process of law is the opportunity to be heard in a meaningful time and in a meaningful manner.'" *Id.* at ¶ 25, quoting *Woods* at 513. The court found that the Reagan Tokes Law satisfies these requirements (originally imposed in *Woods* in the context of post-release control) by requiring that a defendant receive a hearing, notice, and an opportunity to be heard before ODRC may maintain the defendant beyond the minimum prison term. *Id.* Further, the court expressly rejected the application of case law pertaining to the bad-time statute that was struck down in *Bray*, concluding that *Woods* was the closer analog since "under the Reagan Tokes Law a court imposes the 'additional sentence' when imposing a maximum prison term." *Id.* at ¶ 26.

**{¶ 116}** Eight months after it released its decision in *Ferguson*, the Second District issued its decision in *State v. Compton*, 2d Dist. Montgomery No. 28912, 2021-Ohio-1513, which involved, inter alia, a due process challenge to the Reagan Tokes Law. In that case, the defendant argued that the Reagan Tokes Law violates due process because it:

> (1) does not provide sufficient notice of what conduct will cause the ODRC to rebut the presumption for release after expiration of the minimum term; and (2) provides the ODRC with a "high degree of official discretion"

61.

to rebut the presumption for release without sufficient guidance or safeguards to prevent arbitrary and discriminatory enforcement.

*Id.* at ¶ 13. The defendant acknowledged that the Reagan Tokes law afforded him a hearing and statutory findings before additional prison time was imposed, but complained that R.C. 2967.271(C) is too vague as to how the hearing would be conducted or what rights he would have at the hearing. *Id.* at ¶ 16. He asserted that he "should be entitled to due process rights that are associated with criminal trials." *Id.*

{¶ 117} On review, the Second District found that only minimal due process procedures including opportunity to be heard and a statement of the reasons denying release are required in review hearings under the Reagan Tokes Law. *Id.* at ¶ 18. In so concluding, the court applied language from United States Supreme Court precedent in the parole context, including *Greenholtz*. In support of applying parole cases, the court cited a prior decision in which it noted that "[r]equiring a defendant to remain in prison beyond the presumptive minimum term is akin to the decision to grant or deny parole[.]" *State v. Leet*, 2d Dist. Montgomery No. 28670, 2020-Ohio-4592, ¶ 17.

{¶ 118} The Second District released a third decision involving the Reagan Tokes Law on November 12, 2021. In *State v. Thompson*, 2d Dist. Clark No. 2020-CA-60, 2021-Ohio-4027, the court addressed whether the Reagan Tokes law violates a defendant's right to a trial by jury under the Sixth Amendment. The court rejected the defendant's constitutional argument after it distinguished the sentencing scheme embodied in the Reagan Tokes Law from that at issue in the United States Supreme

62.

Court decisions cited by the defendant, namely *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403.

{¶ 119} In distinguishing indefinite sentences under the Reagan Tokes Law from those at issue the aforementioned cases, the Second District observed: "Unlike the sentencing scheme in *Apprendi* and *Ring*, there is 'no discretion exercised by the trial court in imposing the maximum term' under the Reagan Tokes Law, and 'nothing within any provision codified under the Reagan Tokes Law permits any branch of government to impose a sentence beyond the maximum term as defined under R.C. 2929.144.'" *Id.* at ¶ 24, quoting *State v. Gamble*, 2021-Ohio-1810, 173 N.E.3d 132, ¶ 44 (8th Dist.); *see also State v. Rogers*, 12th Dist. Butler No. CA2021-02-010, 2021-Ohio-3282, ¶ 17 (distinguishing the Reagan Tokes Law from *Apprendi*, *Ring*, and *Blakely* based on the fact that a sentencing court operating under the Reagan Tokes Law must impose *both* the minimum and maximum prison term and include the entire indefinite sentence in its final entry of conviction). In that light, the court found that the Reagan Tokes Law does not violate a defendant's constitutional right to a trial by jury. *Id.* at ¶ 25.

{¶ 120} In addition to the foregoing precedent from the Second District, the Eighth District has considered the constitutionality of the Reagan Tokes Law under the Due Process Clause on several occasions, culminating with it extensive treatment of the issue in its recent en banc decision in *Delvallie*, *supra*, 2022-Ohio-470, --- N.E.3d ----, at

63.

¶ 2 (8th Dist.). As noted above, the court in *Delvallie* reviewed and rejected the contention that the Reagan Tokes Law violates the separation-of-powers doctrine.

{¶ 121} Additionally, the court separately examined the due process argument and the argument regarding the Sixth Amendment right to a trial by jury. As to the latter, the Eighth District recognized that, under the Reagan Tokes Law, "the only discretion lies with the length of the minimum term, and therefore, the trial court is not imposing a sentence 'in excess of the maximum' term as expressly prohibited under *Apprendi*. And the trial court is also not imposing a sentence beyond the minimum term prescribed by statute based on any findings of facts." *Id.* at ¶ 44. Thus, the court found that the Reagan Tokes Law does not infringe upon a defendant's Sixth Amendment right to a trial by jury. *Id.* at ¶ 47.

{¶ 122} The court also found that the Reagan Tokes Law provides adequate process to survive a due process challenge. As to what process is required, the court observed that the full panoply of constitutional rights owed a defendant prior to conviction are not required for inmates during the enforcement of judicially imposed sentences. *Id.* at ¶ 50, citing *Morrissey*, *supra*, at 480; *Rose v. Haskins*, 21 Ohio St.2d 94, 95, 255 N.E.2d 260 (1970); and *State ex rel. Sweet v. Capots*, 10th Dist. Franklin No. 93AP-340, 1993 WL 435242, (Oct. 26, 1993). Further, the court found that "there is no inherent right to counsel during a parole revocation hearing, which is analogous to the maximum-term hearing according to the defendants who extensively claimed as much during oral argument on this matter." *Id.*, citing *State ex rel. Marsh v. Tibbals*, 149 Ohio

64.

St.3d 656, 2017-Ohio-829, 77 N.E.3d 909, ¶ 26.  Therefore, the Eighth District found that "[t]he Reagan Tokes Law is not unconstitutional based on the claims presented by the defendants."  *Id.* at ¶ 51.

{¶ 123} The decision in *Delvallie* was not unanimous.  In one of the dissenting opinions written in *Delvallie*, the author, Hon. Lisa Forbes, deemed the Reagan Tokes Law unconstitutional.  Because Judge Forbes' dissent raises significant issues worth evaluating as to the constitutionality of the Reagan Tokes Law, I will examine it carefully.

{¶ 124} Judge Forbes contrasted parole release (or eligibility) and parole revocation, stating: "The distinction between parole eligibility and parole revocation is significant when discussing due process because the liberty interest in parole revocation – which entails taking someone's freedom away – is much greater than the liberty interest in parole eligibility – which typically entails the hope or anticipation of freedom."  *Id.* at ¶ 139, citing *Greenholtz* at 9, and *Wolff*, *supra*, 418 U.S. at 560, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).  Judge Forbes then noted the liberty interest found in the Nebraska law at issue in *Greenholtz* (a parole release case) and *Wolff* (a prison discipline case), as well as the liberty interest found in the California law at issue in *Cooke* (a parole release case) to conclude, like the majority, that "the Reagan Tokes Law creates a liberty interest."  *Id.* at ¶ 142.

{¶ 125} However, Judge Forbes departed with the majority in *Delvallie* in finding that the sentencing scheme under the Reagan Tokes Law did not provide adequate due

65.

process to survive constitutional muster. In particular, she concluded that the Reagan Tokes Law is analogous to parole revocation proceedings and concluded that "R.C. 2967.271 does not contain any due process safeguards." *Id.* at ¶ 124. Because she found that parole revocation, and not parole release, is the appropriate analog to look to for guidance, Judge Forbes concluded that the safeguards outlined in the United States Supreme Court's decision in *Morrissey* were required. *Id*. at ¶ 160. Since those safeguards were not provided under the statutes and the administrative rules promulgated by the ODRC, the author found the Reagan Tokes Law unconstitutional.

### 2. Analysis of Appellant's Due Process Argument

{¶ 126} In advancing his due process argument, appellant contends that he has a liberty interest in being free from confinement after serving his minimum prison term and that due process requires, at minimum, certain basic procedural safeguards including (1) a trial, (2) findings of fact and determination of guilt by a jury, and (3) representation of counsel, including appointed counsel. As already noted, appellant asserts that the Reagan Tokes Law deprives him of his due process rights because it does not afford him any of these safeguards, and thus the Reagan Tokes Law is unconstitutional on its face.

{¶ 127} Examination of the aforementioned case law from the United States Supreme Court reveals that due process challenges are reviewed using a two-part analysis. The first step requires us to examine whether appellant has a liberty interest at stake that entitles him to the protections of the Due Process Clause. The courts that have considered similar due process challenges to the Reagan Tokes Law have had no

66.

difficulty in concluding that defendants do, in fact, have a liberty interest sufficient to trigger due process safeguards. Like the presumptive parole system that was deemed to create an expectancy of parole, and thus a protectible liberty interest, in *Greenholtz*, the rebuttable presumption in favor of release that is set forth in the Reagan Tokes Law gives rise to a liberty interest here.

{¶ 128} In particular, R.C. 2967.271(B) establishes a presumption that a defendant sentenced under the Reagan Tokes Law will be released from prison on the expiration of his minimum prison term. Under R.C. 2967.271(C), this presumption may be rebutted by ODRC, but only after certain procedures are observed and the ODRC makes specific findings to support maintaining the defendant in prison. Further, ODRC has published policy No. 105-PBD-15, which requires that defendants receive notice of additional term hearings. *See* ODRC Policy 105-PBD-15, Section F, available at https://drc.ohio.gov/policies/parole-board (last visited June 8, 2022). These statutory sections, taken together with established ODRC policies, provide Ohio inmates with "some measure of constitutional protection," *Greenholtz*, *supra*, at 12, and establish certain protections that give rise to an expectation in the same type of "meaningful review" found to constitute a liberty interest in *Bailey*. *See also Keith*, *supra*, 141 Ohio St.3d 375, 2014-Ohio-4270, 24 N.E.3d 1132, at ¶ 25 (finding that Ohio's parole statute created a minimal due-process expectation that the factors considered at a parole hearing were to be as described in the statute or rule and were to actually and accurately pertain to the prisoner whose parole was being considered). Thus, I find that appellant has

67.

demonstrated a liberty interest associated with his release from confinement at the expiration of his minimum term.

{¶ 129} I now turn to step two, in which I must determine what process is due. This determination is a flexible one and the procedures must be tailored to the particular situation at hand, in this case the release of an inmate at the expiration of the inmate's minimum term.

{¶ 130} Under the Reagan Tokes Law, a defendant's sentence consists of two components: the minimum prison term and the maximum prison term. The trial judge, in his or her discretion, determines the appropriate minimum prison term within the statutory range for the offense, and then also imposes the maximum term based upon the formula set forth by statute. It must be reemphasized that the trial judge imposes *both* terms at sentencing. The sentence imposed is not merely the minimum prison term, but includes the maximum term as well. After the defendant is sentenced by the trial judge to both terms, the process of criminal conviction is complete. *See United States v. Haymond*, 139 S.Ct. 2369, 2379, 204 L.Ed.2d 897 (2019), citing *Apprendi*, *supra*, 530 U.S. at 481-482, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (recognizing that "a 'criminal prosecution' continues and the defendant remains an 'accused' with all the rights provided by the Sixth Amendment, until a final sentence is imposed"). Because his criminal conviction is already complete, a defendant is not entitled to the "full panoply" of preconviction due process rights by the time he appears before the ODRC for the additional term hearing. *Morrissey*, *supra*, 408 U.S. at 480, 92 S.Ct. 2593, 333 L.Ed.2d

68.

484 (1972). Thus, the question is what process short of the full panoply is required for hearings conducted under Ohio's presumptive parole scheme.[11]

{¶ 131} As articulated in our review of historical case law above, there are at least three post-conviction sentencing situations in which defendants have previously raised due process arguments. These are (1) parole release hearings, (2) probation/parole revocation hearings, and (3) post-release control revocation hearings. The initial parole release hearing is most akin to the review hearing under the Reagan Tokes Law for several reasons. First, the defendant is suffering a loss of his physical liberty in institutional confinement in both situations, unlike the relative freedom he enjoys when already released on parole or post-release control. This is important because a defendant who is already in confinement has a reduced liberty interest and is therefore entitled to less process than a defendant who is already free. Second, in both the parole release hearing and the review hearing under the Reagan Tokes Law, the reviewing body is focused upon whether the defendant's conduct justifies his *release* from confinement, not whether he should be *returned* to confinement. Again, the liberty interests are different and thus the protections to which a defendant is entitled are different.

_____

[11] I emphasize that the constitutional challenge to the Reagan Tokes Law raised by appellant in this case is a facial one similar to the one this court found not ripe for review in *Maddox*. On appeal, the Ohio Supreme Court reversed our ripeness determination as to a *facial* challenge, not an *as-applied* challenge. Such an as-applied challenge is not ripe in this case since appellant has not yet been subjected to the release hearing proceedings. Thus, my focus is on the process the statute provides, not the process actually afforded to appellant at some point in the future.

69.

{¶ 132} Since the trial court imposes *both* the minimum and maximum sentence, a defendant sentenced under the Regan Tokes Law is still serving his sentence at the time of the additional term hearing and, if ordered to serve the indefinite portion of the sentence, will continue to serve the sentence previously imposed by the trial court. Therefore, the issue in the additional term hearing is release from confinement, not revocation of parole. Stripping away the semantics, the reality here is that, from appellant's perspective, he is presently incarcerated and wishes to be freed from incarceration – by definition, this is release and not revocation.

{¶ 133} For these reasons, I find that parole release cases, not parole revocation cases, should guide our understanding of what procedures are required to satisfy due process in cases involving the Reagan Tokes Law. I note that parole statutes like the one at issue in *Greenholtz* and *Cooke*, while slightly different in the manner in which they operate, are nearly identical in terms of the presumption in favor of release on parole. The concurrence makes much of the differences between the procedural mechanics of the statute at issue in *Greenholtz* and the Reagan Tokes Law. While such mechanics may vary from state to state, the fact remains that the liberty interest of a Reagan Tokes defendant is the release from confinement, the same liberty interest at issue in *Greenholtz* and *Cooke*.

{¶ 134} Moreover, the subjectivity embodied in the Nebraska statute at issue in *Greenholtz* is not entirely different from the criteria used under the Reagan Tokes Law, which allows the ODRC to rebut the presumption of release based upon:

70.

(1) the offender's commission of institutional rule infractions (which are promulgated, enforced, and adjudicated by the ODRC during the offender's incarceration prior to the additional term hearing) and behavior that, in ODRC's estimation, poses a threat to society;

(2) the offender's placement in extended restrictive housing within the year preceding the date of the additional term hearing (said placement being instituted at ODRC's discretion); or

(3) the offender's security level (which is determined by ODRC during the offender's incarceration prior to the additional term hearing). *See* R.C. 2967.271(C).

**{¶ 135}** Thus, while the criteria established under the Reagan Tokes Law appears, at least on the surface, to be objective in nature, a closer examination reveals a substantial subjective component to such criteria lying below the surface of that "objective finding." The subjectivity that exists here, albeit prior to the additional term hearing, provides an additional rationale for why this situation is analogous to the Nebraska statute addressed by the court in *Greenholtz*, and thus parole release is the more correct analog through which to evaluate the Reagan Tokes Law under due process.

**{¶ 136}** Therefore, I find no basis to depart from the guidance provided by the court in *Greenholtz* and *Cooke* on the issue of what process is required. I further reject the notion that the Reagan Tokes Law is deficient from a due process perspective based upon its lack of procedural safeguards deemed necessary by the court in *Morrissey* in the

71.

context of parole revocation, because what is at issue here is the initial *release* of appellant from confinement, not the *revocation* of his freedom and placement back into confinement.

{¶ 137} In light of the foregoing, I find that the initial parole release hearing context, especially when the initial release is presumptive, is the closest analog to the sentencing scheme set forth under the Reagan Tokes Law. Thus, it follows that the process required for defendants under the presumptive parole regime is all that is required for defendants like appellant under the Reagan Tokes Law. In *Greenholtz*, *supra*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the United States Supreme Court upheld the Nebraska presumptive parole review procedure, which afforded defendants minimal process including an opportunity to be heard and an explanation of the basis for denial of parole release. *Id.* at 16. In so doing, the court explained:

> It is important that we not overlook the ultimate purpose of parole which is a component of the long-range objective of rehabilitation. The fact that anticipations and hopes for rehabilitation programs have fallen far short of expectations of a generation ago need not lead states to abandon hopes for those objectives; states may adopt a balanced approach in making parole determinations, as in all problems of administering the correctional systems. The objective of rehabilitating convicted persons to be useful, law-abiding members of society can remain a goal no matter how disappointing the progress. But it will not contribute to these desirable

72.

objectives to invite or encourage a continuing state of adversary relations

between society and the inmate.  Procedures designed to elicit specific

facts, such as those required in *Morrissey*, *Gagnon*, and *Wolff*, are not

necessarily appropriate to a Nebraska parole determination.  * * * Merely

because a statutory expectation exists cannot mean that in addition to the

full panoply of due process required to convict and confine there must also

be repeated, adversary hearings in order to continue the confinement.

*Id.* at 13-14.

{¶ 138} Similarly, in *Cooke*, *supra*, 562 U.S. 216, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011), the court reaffirmed its holding in *Greenholtz* that those eligible for parole release are only entitled to minimal procedure including an opportunity to be heard and a statement of the reasons why parole is denied.  *Id*. at 220, citing *Greenholtz* at 16.

{¶ 139} Ohio Supreme Court precedent concerning parole release echoes that of the United States Supreme Court.  In its decision in *Bailey*, *supra*, 152 Ohio St.3d 426, 2017-Ohio-9202, 79 N.E.3d 433 (2017), the court noted that an inmate has "no constitutional right to parole release before the expiration of his sentence," *Id*. at 428, citing *Greenholtz* at 7, and found that due process was provided "[s]o long as each assessment rests on correct facts and falls within permissible guidelines."  *Id*. at 429.

{¶ 140} Put simply, the presumptive parole sentencing structure at issue in *Greenholtz* and *Cooke* is functionally equivalent to the rebuttable presumption in favor of

73.

release set forth in the Reagan Tokes Law. Consequently, *Greenholtz* and *Cooke* are dispositive of the due process issues presented in this case.

{¶ 141} Here, I find that the Reagan Tokes Law, and specifically R.C. 2967.271 provides the due process safeguards that are required under *Greenholtz* and *Cooke*. For example, R.C. 2967.271(C) requires ODRC to hold a hearing in order to rebut the presumption for release. Further, ODRC policy No. 105-PBD-15 requires ODRC to notify an inmate of release hearings in the same manner as it provides notice to inmates of the possibility of release on parole. Additionally, the regulations governing additional term hearings that have been promulgated by the ODRC provide many other safeguards. Included within those regulations is the requirement that the hearing officer review the officer's decision with the inmate and provide the inmate with a copy of the decision. Since all that is required under *Greenholtz* and *Cooke* is minimal process including an opportunity to be heard and an explanation of the basis for denial of parole release, I find that the procedural safeguards afforded defendants under the Reagan Tokes Law are more than sufficient to pass constitutional muster.

### 3. Conclusion – Regan Tokes Law does not Infringe Appellant's Due Process Rights on its Face

{¶ 142} Having reviewed the relevant case law in light of the sentencing scheme set forth in the Regan Tokes Law, it is clear that the General Assembly created a liberty interest when it established a presumption in favor of release at the expiration of an inmate's minimum sentence. Furthermore, this liberty interest entitles defendants like appellant to *some* process before presumptive release is denied. However, only minimal

74.

process is required, including a hearing on the matter with notification of the reasons for denial of such release. R.C. 2967.271 clearly satisfies this requirement; indeed, it provides more process than is required. Further, as already noted, the ODRC has promulgated a policy that provides even greater procedural protections than the statute. Consequently, appellant has not proven beyond a reasonable doubt that the Reagan Tokes Law deprives him of the due process of law to which he is entitled under the Constitution of the United States or the Ohio Constitution.

### E. Disposition of Appellant's Assignment of Error

{¶ 143} Upon due consideration, we find that the sentencing scheme established under the Reagan Tokes Law is constitutional insofar as it does not, on its face, violate well-established separation-of-powers parameters or infringe upon a defendant's due process rights. Appellant has not provided proof beyond a reasonable doubt that no set of circumstances exist under which the Reagan Tokes Law would be valid. Since this is appellant's burden in a facial constitutional challenge, we find his assignment of error is not well-taken.

### III. Judgment Affirmed

{¶ 144} In light of the foregoing, we find substantial justice was done to the party complaining and we affirm the judgment of the Lucas County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.
_____
JUDGE

Christine E. Mayle, J.
CONCURS IN JUDGMENT ONLY
AND WRITES SEPARATELY
_____
JUDGE

Myron C. Duhart, P.J.
CONCURS IN JUDGMENT ONLY
AND CONCURS IN JUDGE
MAYLE'S CONCURRENCE
_____
JUDGE

**MAYLE, J.**

{¶ 145} I concur with the lead decision. I agree with its separation-of-powers analysis, and I agree that Eaton has failed to meet his heavy burden of establishing that the Reagan Tokes law, on its face, is unconstitutional on due-process grounds. I write

separately, however, because I disagree that the liberty interest at stake under the Law is most analogous to parole or probation *release* decisions; I believe the liberty interest at stake under the Law is more analogous to parole or probation *revocation* decisions. For that reason, I disagree with the lead decision's conclusion that the procedural safeguards articulated in the Law itself are sufficient to pass constitutional muster. Nevertheless, because the Law is capable of being applied in such a manner as to afford the required procedural safeguards, I agree with the lead decision that Eaton cannot prevail on this facial challenge to its constitutionality.

### A. The liberty interest at stake under the Reagan Tokes Law is most analogous to parole or probation *revocation* decisions.

{¶ 146} The lead decision correctly explains that the process that is due a defendant depends on the nature of the liberty interest at stake. It properly recognizes that the U.S. Supreme Court differentiates between the liberty interests at stake in probation or parole *eligibility* decisions versus probation or parole *revocation* decisions. Although neither affords a defendant the "full panoply of rights due" in a criminal prosecution, the latter requires greater procedural safeguards than the former. *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Greenholtz v. Inmates of the Neb. Penal and Correctional Complex*, 442 U.S. 1, 10, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). The lead decision concludes that the presumptive-release provisions of the Reagan Tokes Law creates a liberty interest that is more analogous to probation or parole eligibility than to probation or parole revocation because (1) "the defendant is suffering a loss of his physical liberty in institutional confinement in both situations,

77.

unlike the relative freedom he enjoys when already released on parole or post-release control;" and (2) "in both the parole release hearing and the review hearing under the Reagan Tokes Law, the reviewing body is focused upon whether the defendant's conduct justifies his *release* from confinement, not whether he should be returned to confinement."

{¶ 147} Importantly, to clarify, the review hearing under the Reagan Tokes Law is not focused on whether the defendant's conduct "justifies his release from confinement"—it is focused on whether the defendant's conduct justifies *not* releasing him from confinement. This distinction is crucial because the presumption that the offender *will* be released on a date certain, after service of the minimum term—and the burden ODRC must meet to rebut this presumption—goes to the heart of why I believe that the Law is more analogous to the decision to revoke parole or probation. A deeper look at *Greenholtz* demonstrates this point.

{¶ 148} As summarized by the lead decision, the Nebraska statutes at issue in *Greenholtz* provided for the possibility of discretionary parole after an offender served his minimum term, less good-time credits. The Parole Board held two types of hearings: initial review hearings and final parole hearings. Initial review hearings had to be held at least once a year "regardless of parole eligibility." *Id.* at 4. No evidence could be introduced at review hearings, but the board examined the offender's pre-confinement and post-confinement record (including "the circumstances of the offender's offense, the presentence investigation report, his previous social history and criminal record, his

78.

conduct, employment, and attitude during commitment, and the reports of such physical and mental examinations as have been made"), interviewed the offender, and considered any statements or letters the offender wished to present. *Id.* If the board determined that the offender was not yet a good risk for release, it denied parole, informed the offender of its reasons, and made recommendations to correct observed deficiencies. If the board determined that the offender was a good candidate for release, a final hearing took place where the offender could present evidence, call witnesses, and be represented by private counsel. A record of the hearing was preserved and if parole was denied, a written statement was provided within 30 days.

{¶ 149} In a civil rights action brought by inmates alleging due process violations, the Court of Appeals found that even at the initial review stage of a parole eligibility decision, offenders had a "*Morrissey*-type, conditional liberty interest at stake" and should be afforded *Morrissey*-like procedures to protect that interest. *Id.* at 6. The U.S. Supreme Court disagreed. It differentiated parole revocation decisions—where, the Court explained, an offender is threatened with the deprivation of the liberty he *has*—and parole release decisions—where the offender merely *desires* liberty. In doing so, the Court examined the nature of the decision to be made.

{¶ 150} The U.S. Supreme Court recognized that parole-revocation determinations actually require two decisions: "whether the parolee in fact acted in violation of one or more conditions of parole and whether the parolee should be recommitted either for his or society's benefit." *Id.* at 9. It emphasized that the first step in a parole revocation

79.

decision "involves a wholly retrospective factual question." *Id.* at 9. Parole release decisions, on the other hand, are "more subtle and depend[] on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release." (Internal citations and quotations omitted.) *Id.* at 9-10. "Unlike the revocation decision," when the board reviews a parole eligibility decision, "there is no set of facts which, if shown, mandate a decision favorable to the individual." *Id.* at 10. To the contrary, the parole release decision is "subjective" and "predictive," and the statute "vests very broad discretion" in the parole board. *Id.* at 13.

{¶ 151} Ultimately, the Court concluded that the parole board need not inform an offender of the particular evidence in the file or elicited at the offender's interview upon which it relied in making the discretionary determination that the offender was not ready for conditional release. It found that "[t]he Nebraska procedure affords an opportunity to be heard, and when parole is denied, it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances." *Id.* at 16.

{¶ 152} The U.S. Supreme Court relied on the presumptive nature of the Nebraska statute in concluding that an offender had a protectable liberty interest. Importantly, the U.S. Supreme Court in *Sandlin v. Conner*, 515 U.S. 472, 481, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), has since clarified that the nature of the deprivation at issue ought to be the focus rather than the mandatory language in the text of a statute or prison

80.

regulation. Either way, it is my view that the Reagan Tokes Law goes further than the Nebraska statute in *Greenholtz* in creating an expectation of release and, therefore, a liberty interest requiring procedural protections more akin to *Morrissey*.

{¶ 153} The lead decision remarks on the similarities between the Reagan Tokes Law and the Nebraska law at issue in *Greenholtz*—commenting that the Nebraska statute "set forth a presumptive entitlement to parole, like the Reagan Tokes Law." But in doing so, it merely skims the surface of the Nebraska statute. It focuses on language that provides that "[w]henever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it *shall* order his release * * *." (Emphasis added.) *Id.* at 11. It ignores the remaining language in the statute—the deeper substance of the statute—which makes clear that release shall be ordered *unless* the board "is *of the opinion*" that "release should be deferred" for certain enumerated, *subjective* reasons. In other words, while the Nebraska statute does create a presumption in favor of parole, when read as a whole, the discretion granted to the parole board whether to release an offender is extremely broad. This broad discretion is dissimilar to how the Reagan Tokes Law is intended to operate.

{¶ 154} Of course, the Reagan Tokes Law, too, creates a presumption. But unlike the statute in *Greenholtz,* it is presumed that offenders sentenced under the Reagan Tokes Law will be released from prison on a date certain—i.e., after service of their minimum sentence. That presumption may not be rebutted based only on a discretionary, "purely subjective appraisal" whether release is advisable.

81.

{¶ 155} To the contrary, under R.C. 2967.271(B) and (C), an Ohio offender *must* be released after service of the minimum sentence unless ODRC makes the purely factual finding that (1) the offender is a security level three or higher at the time of the hearing, or (2) the offender was placed in extended restrictive housing within the year preceding the hearing—classifications and decisions made pursuant to ODRC's own detailed sets of policies and procedures, as well as administrative rules—*or* (3) during his incarceration, the offender committed rule violations that involved compromising the security of the institution, compromising the safety of the staff or inmates, or physical harm or the threat of physical harm to the staff or, or committed a violation of law that was not prosecuted, and the infractions show that the offender has not been rehabilitated, *and* the offender's behavior while incarcerated demonstrates that he or she continues to pose a threat to society.

{¶ 156} In this way, the Reagan Tokes Law functions unlike the highly discretionary decision to release an offender on parole and more like a parole revocation decision. In the case of R.C. 2967.271(C)(1), it requires two determinations: (1) did the offender, during his incarceration, commit certain rule violations or unprosecuted crimes?—"wholly retrospective factual question[s]"; and (2) does this behavior demonstrate that the offender still poses a threat to society? *Id.* at 8. There is no "subtle," "purely subjective appraisal[]" like the Nebraska parole eligibility statute.[12] For

---

[12] The lead decision contends that there is a "substantial subjective component" lying below the surface of the criteria for rebutting the presumption of release, which takes

82.

these reasons, *Greenholtz* does not support the lead decision's position that the liberty interest at stake under the Reagan Tokes Law is more akin to the liberty interest at stake in a parole release decision rather than a parole revocation decision.

{¶ 157} The lead decision was also persuaded by the distinction between an offender who has already been released from confinement and one who is hoping to be released from confinement. Although that is a relevant consideration in determining the process due, I believe that *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), demonstrates that this is not necessarily dispositive.

{¶ 158} In *Wolff,* the Nebraska prison had a policy permitting officials to extinguish an offender's earned good-time credit as punishment for flagrant or serious misconduct and also permitting it to confine the offender in a disciplinary cell. As summarized by the U.S. Supreme Court, the first mode of punishment "affects the term of confinement," while the second "involves alteration of the conditions of confinement."

---

place "prior to the additional term hearing." I assume the lead decision is referring to the findings underlying R.C. 2967.271(C)(2) and (3) relating to security classifications and placement in extended restrictive housing. Those decisions are made pursuant to ODRC's own detailed sets of policies—and, in the case of restrictive housing, administrative regulations. *See* Ohio Adm.Code 5120-9-9, 5120-9-10, and 5120-9-11. From my review of the relevant ODRC policies, it appears that those decisions are intended to be made based in large part on *objective* factors. *See, e.g.,* ODRC Policy No. 53-CLS-01 (security classifications) (creating a classification process that considers the offender's "behavior and such other objective factors are available and relevant when assessing an individual's institutional security needs"); ODRC Policy No. 53-CLS-04 (placement in extended restrictive housing) (enumerating various administrative and behavioral criteria that must be found before an offender may be placed in extended restrictive housing).

83.

*Id.* at 547.  The inmate-plaintiffs brought suit arguing that "the rules, practices, and procedures * * * which might result in the taking of good time violated the Due Process Clause of the Fourteenth Amendment."  *Id.* at 553.  The state argued that "the procedure for disciplining prison inmates for serious misconduct is a matter of policy raising no constitutional issue."  *Id.* at 555.  The Court observed that lawful imprisonment necessarily strips an offender of many rights and privileges, but it does not wholly strip the offender of constitutional protections.  "[T]here must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application."  *Id.* at 556.

{¶ 159} The Court recognized that the state provided a statutory right to good time, and also specified that that good time could be forfeited only for serious misconduct.  It found that "the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated."  *Id.* at 557.  And because "prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed."  *Id.* at 558.

84.

{¶ 160} The procedure for forfeiting good-time credit in Nebraska was (1) a preliminary conference informing the offender of the misconduct charge and engaging in preliminary discussions of the merits; (2) the preparation of a conduct report and hearing before the Adjustment Committee where the report was read to the offender; and (3) the opportunity at the hearing for the offender to ask questions of the charging party. While the state claimed these procedures were adequate, the court of appeals found that the *Morrissey* due process requirements must be satisfied.

{¶ 161} The U.S. Supreme Court agreed with neither position. It found that the current procedures were deficient, but it also found that the deprivation of good-time credit did not implicate the same liberty interest as parole revocation proceedings, thus not all the process afforded under *Morrissey* was due. Ultimately, it concluded that (1) advanced written notice of the claimed violation must be provided to the offender no less than 24 hours before his appearance before the adjustment committee; (2) the offender must be provided a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken; (3) the offender must be allowed to call witnesses and present documentary evidence if not unduly hazardous to institutional safety or correction goals (and it may be "useful," but not required, for the committee to explain its reasons for not allowing a witness to testify); (4) no confrontation or cross-examination should be required; (5) there should be no right to counsel; (6) illiterate offenders may need aid; and (7) the Adjustment Committee is sufficiently impartial to conduct the hearings. *See also Superintendent, Massachusetts Correctional Institution,*

85.

*Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) ("We now hold that revocation of good time does not comport with 'the minimum requirements of procedural due process' * * * unless the findings of the prison disciplinary board are supported by some evidence in the record.").

{¶ 162} Like the statute in *Wolff,* the Reagan Tokes Law allows for the possibility of good-time credit. R.C. 2967.271(F). This is a separate consideration from the presumption of release after service of one's minimum sentence. As such, I believe it only logical that the process due an offender threatened with an additional period or periods of incarceration would be heightened as compared to those provided to someone who had been rewarded with credit then penalized by extinguishment of that credit. Accordingly, it is my view that the heightened process due under *Morrissey* should be applied to offenders facing an additional period of incarceration under the Reagan Tokes Law.

**B. Eaton cannot prevail on this facial challenge to the constitutionality of the Reagan Tokes Law because the Law is capable of being applied in a manner that would afford the required procedural safeguards.**

{¶ 163} Having concluded that *Morrissey*-type protections were not warranted, the lead decision concludes that R.C. 2967.271 provides the required due process safeguards insofar as (1) "R.C. 2967.271(C) requires ODRC to hold a hearing in order to rebut the presumption for release;" (2) "ODRC policy No. 105-PBD-15 requires ODRC to notify an inmate of release hearings in the same manner as it provides notice to inmates of the

86.

possibility of release on parole"; and (3) "the regulations governing additional term hearings that have been promulgated by the ODRC provide many other safeguards."

{¶ 164} Importantly ODRC has not promulgated "regulations" governing additional term hearings. R.C. Chapter 119 sets forth a detailed process for adopting, amending, or rescinding "rules"—defined in R.C. 119.01(C) to include "regulations." "[A]n administrative rule adopted pursuant to statutory authority has the force of law * * *." *State ex rel. Gallon & Takacs Co., L.P.A. v. Conrad*, 123 Ohio App.3d 554, 559, 704 N.E.2d 638 (10th Dist.1997), *cause dismissed*, 81 Ohio St.3d 1504, 691 N.E.2d 1063 (1998). An administrative policy does not. *See* S*tate ex rel. Sziraki v. Indus. Comm.*, 10th Dist. Franklin No. 10AP-267, 2011-Ohio-1486, ¶ 41, *aff'd sub nom. State ex rel. Estate of Sziraki v. Admr., Bur. of Workers' Comp.*, 137 Ohio St.3d 201, 2013-Ohio-4007, 998 N.E.2d 1074, ¶ 26 (observing that BWC policy did not have the effect of law). As recognized by Judge Forbes in her dissent in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536, ¶ 171 (8th Dist.), *appeal allowed*, 166 Ohio St.3d 1496, 2022-Ohio-1485, 186 N.E.3d 830, "a policy is not a rule." As such, ODRC policy No. 105-PBD-15 is not a "regulation."

{¶ 165} Interestingly, although the lead decision concludes that R.C. 2967.271, *on its face*, provides "more than sufficient" due process protections for offenders, its conclusion expressly depends upon the notice requirements and "other safeguards" of ODRC Policy No. 105-PBD-15—which are not found in R.C. 2967.271. In my view, it is inappropriate to depend upon the provisions of an administrative policy, which lacks

87.

the force and effect of law, to conclude that a statute fully satisfies all of the mandates of constitutional due process on its face. While the actual application of the procedures of ODRC Policy No. 105-PBD-15 would certainly be relevant to an *as-applied* challenge—brought by an offender after having been subjected to an additional-term hearing under R.C. 2967.271(C)—they are irrelevant to appellant's *facial* challenge to R.C. 2967.271, which is limited to the provisions of the statute itself.[13]

{¶ 166} This distinction is crucial. Eaton's challenge to the Law is a facial challenge; it is not an as-applied challenge. For this reason, I would find that Eaton's challenge to the Law must fail because while the specific hearing procedures are not articulated in the Law itself and the current policy does not provide *Morrissey*-type safeguards, the Law is still capable of being enforced in a manner that would not violate his constitutional right to due process.

{¶ 167} A facial challenge to a legislative Act is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). To prevail on a facial challenge to a statute, rule, or ordinance, it must be shown that the law or rule cannot be applied constitutionally in any

---

[13] In any event, given the lead decision's reliance upon ODRC Policy No. 105-PBD-15, I feel compelled to point out that the procedures set forth in that policy fall short of the *Morrissey*-type safeguards that I believe are warranted under the Reagan Tokes Law. In fact, ODRC Policy No. 105-PBD-15 does not even provide all the protections the U.S. Supreme Court held were necessary before prison authorities could revoke good-time credit in *Wolff*. *See Wolff*, 418 U.S. at 563-571, 94 S.Ct. 2963, 41 L.Ed.2d 935.

88.

circumstances. *Toney v. City of Dayton,* 2017-Ohio-5618, 94 N.E.3d 179, ¶ 23 (2d Dist.), citing *Wymsylo v. Bartec, Inc.*, 132 Ohio St.3d 167, 2012-Ohio-2187, 970 N.E.2d 898, ¶ 21. "The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid." *Harrold v. Collier,* 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37, citing *id.*

{¶ 168} In considering the process due a parolee whose parole is being revoked, the U.S. Supreme Court in *Morrissey*, 408 U.S. at 488, 92 S.Ct. 2593, 33 L.Ed.2d 484, acknowledged that most states have enacted legislation setting forth procedural requirements for parole revocation hearings, but others have done so by judicial decision. This recognition is instructive because it necessarily implies that the specific procedural requirements applicable to protect a particular liberty interest need not be set forth in the legislation itself. In other words, *Morrissey* suggests that the Reagan Tokes Law may not be found to be unconstitutional, on its face, as violating due process merely because the specific procedures for invoking an additional period of incarceration are not set forth in the Law itself. So long as ODRC ultimately enforces the law in a manner consistent with the process due an offender, an offender's constitutional rights will not be violated. Moreover, "'the remedy for noncompliance with the *Morrissey* parole-revocation due process requirements is a new hearing, not outright release from prison.'" *State ex rel. Spann v. Mitchell*, 82 Ohio St.3d 416, 417, 696 N.E.2d 589 (1998), quoting *State ex rel. Jackson v. McFaul*, 73 Ohio St.3d 185, 188, 652 N.E.2d 746 (1995).

89.

**{¶ 169}** Here, the Reagan Tokes Law states simply that ODRC may rebut the presumption of release at a "hearing." R.C. 2967.271(C) and (D). It provides no details concerning the type or timing of notice that must be provided to the offender, the procedures for the hearing (including pre-hearing disclosure of evidence, the type of evidence and witnesses that may be presented, or the offender's right to confront and cross-examine adverse witnesses), or the manner in which the offender must be apprised of ODRC's decision. Moreover, no administrative rules have been adopted addressing these details—only an ODRC policy without the effect of law. But given that this is a facial challenge to the Law, it cannot be said at this juncture that the Law "cannot be applied constitutionally in any circumstances." Should the Law ultimately be applied in a manner that is unconstitutional, an offender would not be precluded from challenging the Law as applied. *See, e.g., Wilkinson v. Austin*, 545 U.S. 209, 230, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) ("If an inmate were to demonstrate that the New Policy did not in practice operate in [a constitutionally-permissible] fashion, resulting in a cognizable injury, that could be the subject of an appropriate future challenge.").

**{¶ 170}** I feel it necessary to correct one last misunderstanding evidenced in the lead decision. In a footnote, it acknowledges that this court decided *State v. Stenson*, 6th Dist. Lucas No. L-20-1074, 2022-Ohio-2072, where we addressed both the separation of powers and due-process issues addressed here. Concerning due process, *Stenson* is consistent with my analysis above. The lead decision characterizes its decision and *Stenson* as reaching the "same conclusion" but using "a different analysis." Given that

90.

the lead decision concludes here that "the procedural safeguards afforded defendants under the Reagan Tokes Law are more than sufficient to pass constitutional muster," I do not agree that we have reached the "same conclusion."

{¶ 171} Nevertheless, I concur with the lead decision that the Reagan Tokes Law does not violate principles of separation of powers. I agree that Eaton has failed to meet his heavy burden of establishing that the Reagan Tokes law, on its face, is unconstitutional on due-process grounds. However, given the presumption of release upon service of one's minimum sentence, I would find that *Morrissey* sets forth the process that must be afforded where ODRC seeks to maintain an offender's incarceration for any additional period beyond the minimum sentence imposed by the trial court.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.